# In the United States Court of Federal Claims

No. 21-1028C

(Filed Under Seal:  September 1, 2021)

(Reissued:  September 14, 2021)[1]

| | |
|---|---|
| **VS2, LLC,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THE UNITED STATES,** | ) |
| | ) |
| *Defendant,* | ) |
| | ) |
| **and** | ) |
| | ) |
| **VECTRUS MISSION SOLUTIONS** | ) |
| **CORPORATION,** | ) |
| | ) |
| *Defendant-* | ) |
| *Intervenor.* | ) |
| | ) |

*Paul F. Khoury*, Wiley Rein LLP, Washington, D.C., for Plaintiff.  With him on the briefs were *Craig Smith, Cara L. Lasley,* and *Nicholas L. Perry*.  Also on the briefs were *Cameron S. Hamrick, C. Peter Dungan,* and *Roger V. Abbott*, Miles & Stockbridge P.C., Washington, D.C.

*Sosun Bae*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.  With her on the briefs were *Brian M. Boynton*, Acting Assistant Attorney General, Civil Division, *Martin F. Hockey, Jr.*, Acting Director, and *Douglas K. Mickle*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Also on the briefs were *Dana J. Chase* and *Captain Ethan S. Chae*, United States Army Legal Services Agency, Contract Litigation & Intellectual Property Division, Fort Belvoir, VA.

*Kevin P. Mullen*, Morrison & Foerster LLP, Washington, D.C., for Defendant-Intervenor.  With him on the briefs were *James A. Tucker*, *Alissandra D. Young*, and *Victoria D. Angle*.

---

[1] On September 1, 2021, the Court filed, under seal, this opinion and order and provided the parties the opportunity to propose redactions.  On September 9, 2021, the parties filed joint proposed redactions, ECF No. 45, which this Court adopts, in part, and accordingly reissues this public version of this opinion and order.

<u>**OPINION AND ORDER**</u>

*SOLOMSON*, Judge.

Plaintiff, VS2, LLC ("VS2") challenges the decision of Defendant, the United States, acting by and through the Department of the Army ("Army" or the "Agency"), to switch the award of the Fort Benning Logistics Support Services contract from VS2 to Defendant-Intervenor, Vectrus Mission Solutions Corporation ("Vectrus"), following Vectrus's successful bid protest before GAO. VS2 contends not only that GAO's recommendation was flawed – and, thus, that the Agency should not have followed it – but also that Vectrus's proposal failed to comply with material terms of the solicitation and otherwise was not awardable.

In response, the government and Vectrus attempt to land a massive knock-out punch, in the form of a novel *Blue & Gold* waiver argument, that would have the effect of rendering VS2's entire protest untimely. That argument, however, threatens to reforge *Blue & Gold* from a sensible shield against gamesmanship and unjustifiable delay into a broadsword capable of cutting down even meritorious arguments in a manner our appellate court, the United States Court of Appeals for the Federal Circuit, has never sanctioned. This Court declines to engage in such creative metallurgy. Unless and until the Federal Circuit compels us to do so, *Blue & Gold* cannot be expanded past the factual and procedural circumstances in which the Federal Circuit has applied it.

On the merits, the Court rejects most of VS2's arguments as unsupported, but nevertheless concludes that GAO's decision in this case, recommending award to Vectrus, is clearly erroneous as a matter of law. The result is that, at least on this record, the Agency has failed to support its decision to switch the contract award from VS2 to Vectrus. Accordingly, and for the reasons explained below, the Court **GRANTS** VS2's motion for judgment on the administrative record and **DENIES** the government's and Defendant-Intervenor's respective cross-motions for judgment on the administrative record.

## I.   FACTUAL BACKGROUND[2]

### A.  The Solicitation

On September 18, 2019, the Army issued Solicitation W52P1J-19-R-0070 ("the Solicitation" or "RFP") for logistics support services at Fort Benning, Georgia to holders

---

[2] This background section constitutes the Court's findings of fact drawn from the administrative record. *See infra* Section IV. Other findings of fact are contained in the discussion sections of this opinion. *See infra* Sections V-VIII. Citations to the administrative record (ECF No. 24, as completed and amended by ECF Nos. 32, 36) are denoted as "AR."

of the Army's Enhanced Army Global Logistics Enterprise ("EAGLE") basic ordering agreement.  AR 67.  The anticipated contract covered maintenance, supply, and transportation support services.  *Id.*  The Solicitation informed potential offerors that the Army intended to award a single, cost plus fixed fee task order, with certain firm fixed priced contract line items ("CLINs"), with a period of performance of one base year and four option years.  AR 67.

The Solicitation established four evaluation criteria: (1) technical; (2) past performance; (3) cost/price; and (4) small business participation.  AR 144 (RFP § M.4.1).  The technical and small business participation factors were rated for acceptability only, while the past performance factor had a range of qualitative confidence ratings.  *Id.*  The Solicitation required the Army to award a contract to the offeror with the lowest total evaluated price that also was determined to be technically acceptable, with substantial confidence in past performance and an acceptable rating in small business participation.  AR 67, 143 (RFP § M.1.1).

The Solicitation's instructions clarified that, in order to submit a compliant proposal, "[i]t is the offeror's obligation to submit an unambiguous proposal that clearly reflects the offeror's intended technical approach and establishes cost credibility.  Any inconsistency, whether real or apparent, between promised performance and proposed cost must be adequately explained in the proposal."  AR 125 (RFP § L.4.1.3).  In evaluating the cost/price factor, the Solicitation required the Army to conduct a cost realism analysis, as well as evaluate price reasonableness.  AR 149 (RFP § M.5.3.2).  The Solicitation expressly warned offerors to avoid proposing unrealistically low costs:

> Offerors are cautioned that the Government has concerns with the potential for post-award performance problems if Offerors propose unrealistically low costs.  Therefore, the Government reserves the option of rejecting a proposal if, in the exercise of its judgment, it determines that an Offeror's cost proposal is unrealistically low, regardless of technical merit and/or evaluated costs.

AR 149 (RFP § M.5.3.2.1).  The Solicitation further provided that "failure of the Offeror to establish the credibility of its proposed costs may result in a MPC adjustment being made to the costs proposed, ***and/or the proposal being rejected as unrealistically low and not further considered for award***."  *Id.* (emphasis added).  In that regard, the Solicitation made clear that:

> [I]f a business policy decision to absorb a portion of the estimated cost was made, that approach must be stated within the proposal (including any associated calculations). Failure to adequately explain an inconsistency between promised performance and cost may result in a finding of Technical

> Unacceptability *or* a finding that a proposed cost is unrealistic
> for work to be performed.

AR 125 (RFP § L.4.1.3) (emphasis added).

With respect to the past performance factor, the Solicitation directed that the offeror should "identify all recent contracts where it . . . experienced any performance problems that occurred within three years prior to the closing date of this RFP" and provide corrective action reports, cure notices, nonconformance reports, or show cause letters.  AR 135 (RFP § L.5.3.5.1).

For the technical factor, the Solicitation required offerors to submit a "Staffing and Management Plan," to be evaluated by the Agency to determine if the plan "adequately details a realistic and feasible approach to delivering services required in the PWS."  AR 146 (RFP § M.5.1.2).[3]  Relatedly, offerors had to complete Solicitation Attachment 002 – Staffing/Labor Mix, as part of "present[ing] a staffing approach which demonstrates a thorough understanding of the effort and provides the expected skill sets / skill level of each position, to include level of responsibility in order to successfully perform the specific workload requirements identified at Exhibit A TD-01 Workload and meet all the PWS requirements."  AR 129 (RFP § L.5.2.1.1(c)).

The Army provided offerors with an opportunity to submit questions to the Agency to attempt to clarify any ambiguities in, or to raise other issues with, the Solicitation.  AR 627-29.  An offeror posed a question regarding the type of full-time equivalents ("FTEs") it was permitted to propose:

> The Government instructed industry that all minimum hours
> requirements within TD-01 must be met by utilizing CBA
> positions. We noted the following position was not included
> in the updated CBA-SCA Crosswalk issued with Amendment
> 1: (1) Truck Driver, Medium. Can the government update the
> CBA-SCA crosswalk to include the omitted position?

AR 627.[4]  The government responded: "Not omitted. TD-01 accurately reflects the workload."  *Id*.

---

[3] "PWS" stands for performance work statement.

[4] "CBA" refers to a collective bargaining agreement, and "SCA" refers to the Service Contract Act.  *See* 41 U.S.C. §§ 6701, *et seq*.  Pursuant to the SCA, contractors may be required to pay employees pursuant to a CBA.  41 U.S.C. § 6703.

4

### B.  Proposals, Evaluations, and Initial Award

In response to the Solicitation, several offerors, including VS2 and Vectrus, submitted timely proposals.  *See generally* AR Tab 7, AR Tab 9.  The Army reviewed and evaluated the proposals, established a competitive range, and opened discussions with the three offerors in that range: VS2, Vectrus, and Vanquish Worldwide, LLC ("Vanquish").  *See generally* AR Tabs 10-12.  As part of these discussions, the Army issued evaluation notices ("ENs") to each of the offerors, requiring them to address particular proposal deficiencies the Agency identified.  AR 2810-12, 2837-39, 2850-52.  In one such notice to Vectrus, the Army identified an "inconsistency between the costs/prices proposed in the Cost/Price Volume and the promised performance in the Technical Volume."  AR 2854.  The Army explained:

> Based on review of [Vectrus's proposal] it appears Vectrus has reduced the labor rate for [* * *] FTE to $[* * *]. As required at RFP paragraph L.5.2.12(a)(2) Offerors are instructed that compliance with the SCA/CBA is required. Based on the narrative rationale and cost proposal it would appear the Offeror has discounted the CBA labor rates which is not in compliance with the RFP. It also appears that the Offeror has failed to explain how it intends to compensate the proposed FTE in accordance with the CBA and still perform the requirements at an acceptable level. Therefore, the Government has concerns with the potential for post-award performance problems as the proposed costs appear unrealistically low. The burden of persuasion as to the cost credibility rests with the Offeror.

AR 2857-58.  The Army informed Vectrus that if it failed to explain or remedy the proposed labor rate discounts, "the Government intends to apply an upward Most Probable Cost (MPC) adjustment to ensure that all proposed labor rates comply with the SCA/CBA requirements and all hours proposed in the Technical Volume are priced in the Cost/Price Volume."  AR 2858.

In response to the Army's notice, Vectrus submitted several questions, including the following inquiry:

> (b) . . . [I]s it also an acceptable Business Policy Decision to propose to forgo hiring such deeply discounted FTEs, with the understanding that: (1) mission support would not be negatively impacted, (2) we are basing our Business Policy Decision on documented, historical experience providing equivalent support at Fort Bragg, and (3) should Vectrus at some point need to hire any or all of these FTEs that Vectrus

5

> would bear the full cost of compensating such employees IAW the SCA or CBA?

AR 2886. The Army replied that Vectrus "has not established cost credibility and/or shown that the proposed costs are realistic for the promised performance," adding that "based on question (b) it appears there is an inconsistency between the promised performance in the technical volume and the costs proposed as the offeror refers to forgoing the hiring of these FTE." AR 2887. The Army also stated that "Offerors are required to meet the minimum requirements of the RFP. Additionally, question (b) refers to forgoing the hiring of the FTE in question, which is not reflected in the Offeror's Technical Volume." AR 2887.

Vectrus ultimately submitted a revised proposal in which Vectrus represented that it would absorb the labor costs of [*  *  *] FTEs. AR 4600. Vectrus described this decision as providing a "no-risk cost savings of $22,176,308" to the Army. *Id.* Vectrus explained its ability to absorb the costs, as follows:

> Vectrus is a financially sound and transparent publicly traded corporation with a strong cash position; as such, our company is fully capable of absorbing the cost of this Business Policy Decision. Vectrus formally acknowledges and accepts the risks and responsibilities associated with this decision. This decision will not impact our operational approach to managing and executing the Fort Benning Task Order (TO) PWS technical requirements and achieving the associated . . . performance standards.

AR 4600.

After receiving revised proposals, the Army conducted a final evaluation. AR 5606-5611 (Final Evaluation Summary). The Army concluded that all three offerors were technically acceptable, and had submitted an acceptable small business participation plan. AR 5611. The Army also assigned both VS2 and Vectrus "substantial confidence" past performance ratings. AR 5611. When evaluating cost/price, however, the Army – based on concerns with Vectrus's revised Business Policy Decision – adjusted Vectrus's proposed price upwards by $19,719,898, for a total MPC of $270,551,185. AR 5540. The Army's cost-realism analysis determined that Vectrus's proposed business policy decision – promising a cost credit – was unrealistic because: (1) based on Vectrus's questions regarding the evaluation notice, Vectrus would likely forego the hiring of [*  *  *] FTEs, creating an inconsistency with the technical volume, as well as posing a risk to the government in the form of post-award performance problems; and (2) the proposed cost credit is higher than the proposed fee ($17,839,964 for the cost credit versus $[*  *  *] for the fee) and, therefore, the proposed credit is unrealistic because it would not be covered by the proposed fee if issues were

to arise during performance of the contract.  AR 5566.  With this MPC adjustment, Vectrus's final proposed price of $270,551,185 was higher than VS2's proposed price of $257,097,548. AR 5467, AR 5540.  The Army concluded that VS2 submitted the proposal with the lowest total evaluated price that was technically acceptable, with substantial confidence in past performance (and an acceptable small business participation plan); the Agency selected VS2 for the award.  AR 5590-91.

Vectrus requested a post-award debriefing, which the Army provided.  AR 5923-32.  In response to Vectrus's questions, the Army reiterated that it viewed Vectrus's proposed cost absorption as unrealistic:

> The offeror lacked cost credibility IAW L.5.4.1.3 as the proposed cost credit well exceeded the amount of fixed-fee proposed. The offeror did not establish credibility with its final proposal revision with rationale explaining how the offeror would fund the delta in cost. The offeror simply states that corporate proceeds would be used to absorb the costs for the [* * *] FTE for which a credit is applied; however, did not explain why it feels this is a realistic approach *or how the offeror would still perform at an acceptable level*; therefore, the proposed credit was determined to be unrealistic.

AR 5928 (emphasis added).  The Army also explained that Vectrus's "proposed costs do not reflect the true cost or performance and in the face of competitive pressure [Vectrus] submitted an unrealistically low price in order to win the contract (buying in); with the expectation of recouping all or most of the costs related to cost overrun or on change orders."  AR 5929.

### C.  Vectrus's GAO Protest

On July 9, 2020, Vectrus filed a protest with GAO, in which Vectrus alleged that the Army "unreasonably rejected one of Vectrus's compliant and legally binding business policy decisions" to absorb labor costs; in a nutshell, Vectrus challenged the Army's assessment of the MPC adjustment to Vectrus's proposed cost/price.[5] AR 5763, 5775.  Vectrus contended that "[i]t was unreasonable and a violation of the terms of the Solicitation and the regulations governing cost-realism analysis for the Agency to apply an MPC adjustment."  AR 5764.

On October 27, 2020, GAO sustained Vectrus's protest, concluding that the Army had improperly made an upward MPC adjustment to Vectrus's proposed cost.  AR 6382-92.  GAO concluded that the cost evaluator had made an "unwarranted

---

[5] Vanquish also filed a protest at GAO, which GAO dismissed on the grounds that Vanquish was not an interested party.  AR 6382, 6385.

assumption about Vectrus's potential behavior during contract performance" – *i.e.*, that Vectrus may forego hiring the [* * *] FTEs – based on an exchange with Vectrus during discussions. AR 6390. GAO also concluded that the Agency made the cost adjustment based on an "unsubstantiated belief about the fiscal wherewithal of Vectrus[,]" despite Vectrus's express assumption of legal liability for its cost reduction. AR 6390. GAO explained that:

> [W]here a firm offers a cap or ceiling on a particular cost that limits the government's liability and shifts liability for the cost to the offeror--and no other issue calls into question the effectiveness of the cap--any upward adjustment to the capped cost is improper. Any question concerning a firm's ability to perform the contract in light of a capped cost that is below the actual cost is a matter of the firm's responsibility rather than a matter to be considered by the agency in its cost realism evaluation.

AR 6386 (citing *Affordable Eng'g Servs., Inc.*, B-407180.4, 2015 CPD ¶ 334, 2015 WL 7450123, *5-*6 (Aug. 21, 2015)); *see also* AR 6391 (concluding that "where, as here, a firm offers a cap or ceiling on a particular cost that effectively limits the government's liability and shifts liability for the cost to the offeror . . . , the only appropriate consideration for the agency is whether the offeror may be found responsible in light of the proposed assumption of liability"). GAO determined that without the improper cost adjustment, Vectrus's total evaluated cost/price would have been $250,831,287, which was lower than VS2's cost/price. AR 6391. As a result, GAO recommended that the Army terminate the task order issued to VS2 and issue the award, instead, to Vectrus, "if otherwise proper." AR 6392.

Following GAO's decision, the Agency considered its options[6] and, ultimately, elected to follow GAO's recommendation to award the task order to Vectrus. AR 6393, 6396-97. On November 10, 2020, the Army notified VS2 that its contract award would

---

[6] Following GAO's decision, the Army was faced with two options:

> COA 1: Accept GAOs recommendation. Take corrective action by T4Cing VS2 Task Order and issue the task order to Vectrus as the apparent low- cost/price acceptable offeror with a substantial confidence rating for past performance, if otherwise proper.

> COA 2: Not accept/disregard GAO's recommendation. Proceed with award to VS2 which would require: 1. a reasonable rationale as to why the GAO got its decision wrong, or 2. compelling reasons. To move forward with this approach, the Sec Army must approve, with AMC Concurrence.

AR 6393. "T4Cing" presumably refers to the issuance of a termination for convenience.

be terminated for convenience.  AR 5675.  On December 4, 2020, the Army officially awarded the contract to Vectrus.  AR 5686.

On December 11, 2020, VS2 filed a protest at GAO challenging the Army's decision to award the contract to Vectrus.  AR 6472.  On February 25, 2021, GAO dismissed VS2's protest, holding that it was an untimely request for reconsideration of the *Vectrus* protest decision and that at least one argument, regarding past performance, should have been raised in that earlier GAO proceeding.  AR 6765-72.

## II.    PROCEDURAL HISTORY

On March 4, 2021, VS2 filed its complaint in this Court.  ECF No. 1.  On April 15, 2021, VS2 filed a motion to amend its complaint, which this Court granted.  ECF No. 26 ("Am. Compl.").  VS2 asserts in its amended complaint that: (1) the Army implemented corrective action based on a GAO decision and recommendation that were irrational; (2) the Army irrationally failed to consider the performance risk resulting from Vectrus's proposal to absorb a significant sum of the performance costs; (3) the Army never considered how the proposed cost absorption impacted Vectrus's responsibility; (4) Vectrus should not have received a past performance rating sufficient to have been considered for award in the first place because of poor performance on other Army contracts; and (5) Vectrus should not have been considered for award because its proposal deviated from the terms of the Solicitation by substituting lower-cost labor categories for those specified in the TD-01 Solicitation spreadsheet offerors were required to complete.  Am. Compl. at 2-5.  Vectrus filed an unopposed motion to intervene, which this Court granted.  ECF No. 10, Minute Order (Mar. 5, 2021).

On March 25, 2021, the government filed the administrative record.  ECF No. 24.  On May 3, 2021, the parties filed their motions for judgment on the administrative record.  ECF Nos. 29-2 ("Pl. MJAR"), 30 ("Intv. MJAR"), 31 ("Def. MJAR").  On June 14, 2021, the parties filed their responses.  ECF Nos. 37 ("Pl. Resp."), 38 ("Def. Resp."), 39 ("Intv. Resp.").  On July 13, 2021, the Court held oral argument on the parties' pending motions.  ECF Nos. 40, 42 ("Oral Arg. Tr.").

## III.    JURISDICTION AND STANDING

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870, provides this Court with "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  "An interested party is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract."  *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012).  To satisfy the "direct economic interest"

requirement in a post-award bid protest, a plaintiff "must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).

Neither the government nor Vectrus contends that VS2 lacks standing to maintain its amended complaint.

## IV.    STANDARD OF REVIEW

Judgment on the administrative record pursuant to RCFC 52.1 "is properly understood as intending to provide for an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The rule requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record." *Id.* at 1354. The Court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the record evidence. *Id.* at 1356–57.

Generally, in an action brought pursuant to § 1491(b) of the Tucker Act, the Court reviews "the agency's actions according to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706." *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019). Pursuant to the APA standard of review, the Court asks "whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)). The Court must "determine whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Id.* (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009)).

"When a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (internal citations omitted). The Court thus must determine whether "the agency entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.–Birmingham v. United States,* 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). An agency's decision also may be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider." *Technica LLC v. United States*, 142 Fed. Cl. 149, 154 (2019) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Impresa Construzioni*

*Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (citing *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

Further, "[w]hen applying [the arbitrary and capricious] standard of review in the context of reviewing an agency's decision to follow a GAO recommendation, [the Federal Circuit has] stated that an agency's decision lacks a rational basis if it implements a GAO recommendation that is itself irrational." *Turner Const. Co. v. United States*, 645 F.3d 1377, 1383 (Fed. Cir. 2011) (citing *Centech Grp. v. United States*, 554 F.3d 1029, 1039 (Fed. Cir. 2009), and *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989)). The controlling inquiry is thus "whether the GAO's recommendation was itself rational." *Raytheon Co. v. United States*, 121 Fed. Cl. 135, 151, *aff'd*, 809 F.3d 590 (Fed. Cir. 2015).

## V.   THE *BLUE & GOLD* WAIVER RULE DOES NOT GENERALLY PRECLUDE VS2'S PROTEST

Vectrus argues at length that the Federal Circuit's decision in *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007), "binds the Court of Federal Claims" and "applies equally to solicitation defects and conflicts of interest as [well as] to corrective action challenges." Intv. MJAR at 16. Vectrus thus maintains that *Blue & Gold* requires the dismissal of all of VS2's claims in this case because VS2 "objected" to the Agency's actions at issue "only after the Agency completed its corrective action . . . ." *Id.* at 19-20. This Court is in complete agreement with Vectrus that "[u]nless the Supreme Court or an *en banc* decision of the Federal Circuit" decides otherwise, "binding precedent requires this Court to continue to apply the *Blue & Gold* waiver rule in accordance with the broadly applicable logic that underlies it." *Id.* at 17. In that regard, there is no question that the Federal Circuit repeatedly has applied and affirmed the vitality of the *Blue & Gold* waiver rule.[7] While this Court ultimately

---

[7] *Moore's Cafeteria Servs. v. United States*, 314 F. App'x 277, 279 (Fed. Cir. 2008) ("[W]e agree with the trial court that [plaintiff] waived the ability to challenge the terms of the solicitation by failing to object prior to the close of bidding."); *Burney v. United States*, 499 F. App'x 32, 34 (Fed. Cir. 2012) ("But if the solicitation or Amendment 1 was flawed, then Burney was required to object before the award."); *Bannum, Inc. v. United States*, 779 F.3d 1376, 1380 (Fed. Cir. 2015) ("A bidder that challenges the terms of a solicitation in the Court of Federal Claims generally must demonstrate that it objected to those terms 'prior to the close of the bidding process.' If it cannot do so, the bidder 'waives its ability to raise the same objection afterwards in a § 1491(b) action.'" (quoting *Blue & Gold*, 492 F.3d at 1315)); *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1313 (Fed. Cir. 2016) ("A patent defect triggers the obligation to challenge the solicitation language and failure to do so generally constitutes waiver."); *Eskridge & Assocs. v. United States*, 955 F.3d 1339, 1345 n.5 (Fed. Cir. 2020) ("To the extent that Eskridge is protesting the terms of the 2018 Solicitation, such a challenge is untimely."); *Land Shark Shredding, LLC v. United States*, 842 F. App'x 589, 593 (Fed. Cir. 2021) (citing *Blue & Gold*, 492 F.3d at 1313, in support of holding that plaintiff-appellant "has forfeited any challenge to the application of FAR 13.106-3 to this solicitation by not raising it while the procurement was pending").

disagrees with the government and Vectrus regarding just how "broadly applicable" the *Blue and Gold* waiver rule is, Intv. MJAR at 17, the parties' *Blue & Gold* argument deserves a more detailed analysis here.

In *Blue & Gold*, the Federal Circuit held, for the first time, "that a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." 492 F.3d at 1313.  Although this "waiver rule" has been criticized as "a judicially-created time bar[,]" *see Inserso Corp. v. United States*, 961 F.3d 1343, 1353 (Fed. Cir. 2020) (Reyna, J., dissenting),[8] the Federal Circuit's holding in *Blue & Gold* is rooted (albeit somewhat loosely) in the statutory text providing this Court with jurisdiction to decide procurement-related actions:

> Section 1491(b) of title 28 U.S. Code provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency." 28 U.S.C. § 1491(b)(1). In doing so, the statute mandates that "the courts shall give due regard to the interests of national defense and national security and *the need for expeditious resolution of the action*." *Id.* § 1491(b)(3) (emphasis added). Recognition of a waiver rule, which requires that a party object to solicitation terms during the bidding process, furthers this statutory mandate.

*Blue & Gold*, 492 F.3d at 1313 (emphasis in original).[9]  In essence, then, the Federal Circuit in *Blue & Gold* did nothing more than operationally-define the nebulous statutory command in § 1491(b)(3) as imposing a *per se* deadline for challenges to the terms of a solicitation.  *Id.* at 1315 (explaining that "while it is true that the jurisdictional grant of 28 U.S.C. § 1491(b) contains no time limit requiring a solicitation to be challenged before the close of bidding, the statutory mandate of § 1491(b)(3) for courts

---

[8] *See ATSC Aviation, LLC v. United States*, 141 Fed. Cl. 670, 693 (2019) (addressing the government's argument "that *COMINT Systems Corp. v. United States*, 700 F.3d 1377 (Fed. Cir. 2012), expanded the judicially-created [*Blue & Gold*] waiver rule").

[9] *Inserso*, 961 F.3d at 1349 n.1 (explaining that *Blue & Gold* "establishes a 'waiver rule' under a specific statutory authorization—the congressional command that bid-protest jurisdiction under 28 U.S.C. § 1491(b) be exercised with 'due regard to the ... need for expeditious resolution of the action'" (quoting 28 U.S.C. § 1491(b)(3))); *Bannum*, 779 F.3d at 1380 ("Our waiver rule implements Congress's directive in the Administrative Dispute Resolution Act (ADRA) of 1996, Pub. L. No. 104–320, § 12, 110 Stat. 3870, 3874, that courts 'shall give due regard to ... the need for expeditious resolution' of protest claims." (quoting 28 U.S.C. § 1491(b)(3))); *SEKRI, Inc. v. United States*, 152 Fed. Cl. 742, 753 (2021) (noting that "the majority in *Inserso* firmly grounded *Blue & Gold Fleet*'s waiver rule in the statutory text of 28 U.S.C. § 1491(b)(3)").

to 'give due regard to ... the need for expeditious resolution of the action' and the rationale underlying the patent ambiguity doctrine favor recognition of a waiver rule").

The government and Vectrus contend that *Blue & Gold* should apply "to corrective action challenges" and, more broadly, to any "alleged problem in the procurement process." Intv. MJAR at 14-15 (Vectrus arguing that "[i]f an offeror identifies an alleged problem in the procurement process, it is not permitted to wait for the Government and other parties to incur time and effort to undertake that allegedly flawed process, to wait and see who wins the contract"); *see also* Def. MJAR at 11 (government arguing that "both the Court of Appeals for the Federal Circuit and this Court have expanded the reasoning of *Blue & Gold* beyond its original scope" and that "this Court has frequently held that waiver pursuant to *Blue & Gold* applies to a protestor who waits to contest a corrective action until after the agency has issued a new award"). VS2 counters that "[t]he Federal Circuit's expansions of *Blue & Gold* have been incremental, addressing solicitation defects and anchored in considerations of efficiency and fairness." Pl. Resp. at 5.

In resolving the parties' disagreement regarding whether VS2's action is timely, the Court begins with the plain language of our jurisdictional statute – the Tucker Act, as amended, *see* 28 U.S.C. § 1491 – and its related statute of limitations, *see* 28 U.S.C § 2501. If this Court were writing on a *tabula rasa*, the issue presented would be an easy call, as there is simply no language in either statute that makes VS2's action here untimely; even according to the government and Vectrus, VS2 is nowhere near the six-year statute of limitations. 28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."). While 28 U.S.C. § 1491(b)(3) commands that the Court consider "the need for expeditious resolution of the action[,]" that does not, by its plain terms, dictate dismissal of an action, but rather "limits the relief that can be granted." *SEKRI*, 152 Fed. Cl. at 753 ("The court, for example, cannot grant relief to a protestor who challenges the terms of a solicitation years after the proposal deadline, even if the protestor's complaint is filed before the statute of limitations.").

Notwithstanding the absence of plain statutory language precluding VS2's claims here as untimely, this Court is, of course, bound to follow the Federal Circuit's decisions, including its *Blue & Gold* waiver rule and its later applications of that rule. The rationale for the *Blue & Gold* waiver rule – albeit based upon the statutory command in 28 U.S.C. § 1491(b)(3) – is narrow:

> In the absence of a waiver rule, a contractor with knowledge of a solicitation defect could choose to stay silent when submitting its first proposal. If its first proposal loses to another bidder, the contractor could then come forward with the defect to restart the bidding process, perhaps with

> increased knowledge of its competitors. A waiver rule thus prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation. Accordingly, the same reasons underlying application of the patent ambiguity doctrine against parties to a government contract speak to recognizing a waiver rule against parties challenging the terms of a government solicitation.

*Blue & Gold*, 492 F.3d at 1314.

As noted above, the Federal Circuit thus limited its holding to a bright-line deadline for challenging the terms of a solicitation: "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so *prior to the close of the bidding process* waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims." *Id.* at 1315 (emphasis added). Indeed, there is no suggestion whatsoever in *Blue & Gold* that its waiver rule applies to anything other than an action challenging the terms of a solicitation. *See Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1363 (Fed. Cir. 2009) ("In *Blue & Gold Fleet* we held 'that a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.'" (quoting *Blue & Gold*, 492 F.3d at 1313)); *Eskridge*, 955 F.3d at 1345 n.5 (explaining *Blue & Gold*, 492 F.3d at 1313, as "holding that a party waives the ability to object to the terms of a solicitation if it fails to do so before the close of the bidding process"). Accordingly, the Court agrees with VS2 that "*Blue & Gold* does not articulate a rigid deadline that inescapably applies whenever an offeror might possibly have lodged its protest before contract award." Pl. Resp. at 5.

But what about the Federal Circuit's subsequent applications of *Blue & Gold*? At oral argument, the Court expressed skepticism – prematurely, as it turns out – of the notion that the *Blue & Gold* waiver rule might apply in situations where there is no bright-line, date-certain filing deadline that a plaintiff could determine in advance (*e.g.*, the proposal due date for solicitation protests). Oral Arg. Tr. 38-39. In that regard, the Court challenged the government to identify precisely "[w]hen did Plaintiff have to file this protest with this Court?" *Id.* at 38:21-22. The government conceded that "[t]here was not a specific date[,]" *id.* at 38:25, but asserted that the government was not "arguing for anything *per se* here" and that "the lack of a . . . concrete firm deadline is not prohibitive." *Id.* at 39:11-14. In response to a follow-up question from the Court, the government relied upon *COMINT* and *Inserso* as the two Federal Circuit decisions that best support the government's position regarding the application of *Blue & Gold* to the facts and circumstances of this case. *Id.* at 39:16-20.

After further review of *COMINT* and *Inserso*, the Court agrees with the government that the lack of a determinate, date-certain deadline does not preclude the application of the *Blue & Gold* waiver rule.  Put differently, the fact that VS2 did not know precisely when the government was going to award the contract at issue here to Vectrus – following the first GAO decision – does not preclude the application of the *Blue & Gold* waiver rule.  Indeed, there is a fair amount of language in *COMINT* and *Inserso* that generally favors the government's and Vectrus's view.  *See, e.g., COMINT*, 700 F.3d at 1382 ("The same policy underlying *Blue & Gold* supports its extension to all pre-award situations."); *id.* at 1383 (citing 4 C.F.R § 21.2 for the position that "[u]nless the basis for the protest becomes apparent later than ten days before the award, the GAO does not permit a disappointed bidder to wait until after the award" and that "[i]t would be incongruous to bar later GAO protests but to permit a later court challenge"); *Inserso*, 961 F.3d at 1352 ("Because a bidder in the small-business competition exercising reasonable and customary care would have been on notice of the now-alleged defect in the solicitation long before the awards were made, Inserso *forfeited its right to raise its challenge by waiting until awards were made.*" (emphasis added)).

After further consideration, however, the Court stands by its initial conclusion, expressed during oral argument, that *Blue & Gold* does not preclude VS2's action.  In *Inserso*, the Federal Circuit explained its previous decisions as follows:

> In *Blue & Gold Fleet, L.P. v. United States*, we held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."  492 F.3d 1308, 1313 (Fed. Cir. 2007).  We have since held that this reasoning "applies to all situations in which the protesting party had the opportunity *to challenge a solicitation before the award* and failed to do so." *COMINT Systems Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012). The Court of Federal Claims has correctly applied this rule in organizational-conflict-of-interest cases, including cases dealing with the disclosure of pricing information during debriefing.  *See Ceres Envtl. Services, Inc. v. United States*, 97 Fed. Cl. 277, 310 (2011).

*Inserso*, 961 F.3d at 1349 (emphasis added to *COMINT* quote).

As the Court understands these cases applying *Blue & Gold*, all the Federal Circuit did was shift, until the contract award date, the cut-off for a challenge to a solicitation that would not have been possible prior to the proposal due date.  *See* Pl. Resp. at 5-6 (VS2 arguing that "this solicitation-only scope has remained from *COMINT* to the more recent *Inserso*").

For example, in *COMINT*, an agency amended the solicitation "after the bidding process closed," but the plaintiff waited until after contract award to protest the amendment. *COMINT*, 700 F.3d at 1382. The Federal Circuit held: "[W]here bringing the challenge prior to the award is not practicable, it may be brought thereafter. But, assuming that there is adequate time in which to do so, a disappointed bidder must bring a challenge to a solicitation containing a patent error or ambiguity prior to the award of the contract." *Id.* Thus, *COMINT* may be read as *expanding* the time in which a solicitation challenge may be filed in this Court where the grounds for the protest did not exist prior to the proposal due date – a common sense proposition given that a plaintiff could not, without the advantage of a time machine or crystal ball, have known about the basis for its action. On the other hand, the fact that the award date is not known to the offerors does not mean that a prospective plaintiff may adopt a wait-and-see posture. Hence, the Federal Circuit moved the deadline for such solicitation challenges (arising after the proposal due date) to the contract award date even though that precise date may not be known to a would-be plaintiff.

*Inserso* similarly involved a solicitation challenge. *Inserso*, 961 F.3d at 1350 (holding that "Inserso should have challenged the solicitation before the competition concluded"); *id.* at 1352 ("Because a bidder in the small-business competition exercising reasonable and customary care would have been on notice of the now-alleged defect in the solicitation long before the awards were made, Inserso forfeited its right to raise its challenge by waiting until awards were made.").

Finally, in *Ceres* – a decision the Federal Circuit cited with approval in *Inserso* – this Court clearly addressed a solicitation protest. *Ceres Envtl. Servs.*, 97 Fed. Cl. at 310 (2011) ("If Plaintiff believed that the procedure for the recompetition had to be amended to ensure that all offerors' pricing be released, it had an obligation to raise this argument *prior to the closing date for receipt of proposals*. Plaintiff's attempt to challenge the ground rules of the bidding process after award is untimely." (emphasis added) (citing *Blue & Gold*, 492 F.3d at 1313)).

Although the government understandably points to other decisions from this Court putatively involving protests other than those based upon a challenge to a solicitation,[10] the undersigned will not expand *Blue & Gold* any further than the Federal Circuit already has. In that regard, all of these cases – *Blue & Gold, COMINT,* and even *Inserso* – are nothing more than *per se* rules implementing what is otherwise broad, hortatory statutory language that is more appropriately read as generally placing weight on specific considerations in the context of the trial court's deciding whether to

---

[10] *See, e.g.*, Def. Resp. at 2-4 (discussing, among other decisions, *Sonoran Tech. & Pro. Servs., LLC v. United States*, 135 Fed. Cl. 28, 35 (2017)).

issue equitable relief – a decision within its sound discretion – and not as a *per se* restriction on a plaintiff's ability bring claims in the first instance.[11]

None of that is to say that this Court takes any issue whatsoever with the *Blue & Gold* waiver rule, in general, or any of its Federal Circuit progeny.  Indeed, even putting aside that this Court is bound to follow all of those decisions – reading them in harmony as best as possible – the waiver rule as applied in the context of a solicitation challenge is, in this Court's view, an eminently practical and a reasonable instantiation of 28 U.S.C. § 1491(b)(3).[12]  But, there is an untraversable gulf between that rule, on the one hand – even as implemented in *COMINT* and *Inserso* – and the wholesale adoption

---

[11] *See Inserso*, 961 F.3d at 1355 (Reyna, J., dissenting) ("When both provisions are read in harmony, the 'due regard' provision refers to the [Court of Federal Claims'] need to consider expeditious resolution of bid protests when deciding the proper relief.").  The Court thus agrees with Judge Hertling's proposed approach to reconciling *Blue & Gold*, the statutory basis for its waiver rule, and Judge Reyna's dissent in *Inserso*:

> Given the waiver rule's statutory underpinning (28 U.S.C. § 1491(b)(3)) and the six-year statute of limitations of 28 U.S.C. § 2501, the waiver rule may support a different outcome if the protestor seeks bid preparation costs.  *See Inserso*, 961 F.3d at 1352-56 (Reyna, J., dissenting) (raising objections to the *Blue & Gold Fleet* waiver rule).  Because protesters are primarily interested in securing the contract award, the cases have focused on claims for injunctive relief.  The distinction between the type of relief sought in the application of *Blue & Gold Fleet* appears to remain unexplored territory.  One possible course through which the Federal Circuit will resolve the various strands of precedent, including its labeling of the waiver rule in *Inserso*, 961 F.3d at 1352, as a limitation on relief, and wrestle with the substance of Judge Reyna's dissent would be to hold that waiver under *Blue & Gold Fleet* ultimately does not compel dismissal, under either RCFC 12(b)(1) or (b)(6).  Instead, the Federal Circuit could determine that the waiver rule forecloses a court's ability to grant injunctive relief.  That approach, which seems most consistent with the language of § 1491(b)(3) on which the waiver rule is based, would leave open the possibility that plaintiffs could still obtain bid preparation costs, even in the face of a *Blue & Gold Fleet* waiver. In any event, the Federal Circuit has not yet even started down this path. . . .

*SEKRI*, 152 Fed. Cl. at 753 n.5; *cf. DGR Assocs., Inc. v. United States*, 690 F.3d 1335, 1343 (Fed. Cir. 2012) (*Blue & Gold* waiver rule is not jurisdictional).

[12] *DGR Assocs.*, 690 F.3d at 1343 ("In *Blue & Gold Fleet* the point made is straight-forward—if there is a patent, *i.e.*, clear, error in a solicitation known to the bidder, the bidder cannot lie in the weeds hoping to get the contract, and then if it does not, blindside the agency about the error in a court suit.").

of GAO's timeliness rules, on the other.  The latter is what the government, in essence, appears to be asking the Court to do in this case.  *See* Def. Resp. at 4; Pl. Resp. at 11.[13] But, the mere fact that the Federal Circuit has cited such GAO timeliness regulations on occasion to explain the policy considerations underlying the *Blue & Gold* waiver rule does not mean that 28 U.S.C. § 1491(b)(3) may be read to import those regulations, verbatim, into the Tucker Act (as amended by ADRA).  If Congress wanted to enact such timing constraints, thereby imposing the same or similar GAO rules on this Court, Congress surely knows how to do so.  In the absence of such duly enacted legislation, signed into law by the President, this Court will not take an editor's red pen to our jurisdictional statute or the applicable statute of limitations.[14]

Finally, the factual circumstances at issue here are readily distinguishable from those in *COMINT* and *Inserso*.  VS2, in this case, could not have immediately filed suit challenging GAO's October 2020 decision because, as VS2 points out, "GAO's recommending corrective action did not, on its own, guarantee that the Army would implement it."  Pl. Resp. at 4.  And, while GAO held that VS2's challenge to the Agency's subsequent contract award to Vectrus – *i.e.*, as a result of implementing GAO's recommendation – was untimely, VS2 cannot be said to have sat on its rights.  To the contrary, VS2 protested *that* award at GAO within seven days, on December 11, 2020.  AR 6472.  This Court agrees with VS2 that the fact that GAO ultimately determined that VS2's protest of that award was untimely does not mean that VS2 forfeited its cause of action in this Court pursuant to 28 U.S.C. § 1491(b).  In that regard, GAO's timeliness issue must not have been so straightforward, given that, as VS2 points out, GAO's decision was not issued until "much later," Pl. Resp. at 9, on February 25, 2021.  AR 6765-72.[15]  Following that decision, VS2 proceeded to this Court

---

[13] *See also* Oral Arg. Tr. 89:13-25 (suggesting application of GAO's ten day rule); *but see id.* at 40:3-5 (government counsel acknowledging "that this Court has not adopted GAO's specific 10-day rule").

[14] In the interest of complete candor, this Court agrees with Judge Reyna's dissent in *Inserso* at least insofar as applied to the government's argument in favor of yet further expansion of the *Blue and Gold* waiver rule.  *See ATSC Aviation*, 141 Fed. Cl. at 695 ("The waiver rule generally operates against challenges to the solicitation, against which ATSC makes no challenge. The Federal Circuit has never addressed the applicability of the waiver rule outside the context of a protest to a solicitation.").

[15] According to at least one commentator, GAO's timeliness decision in this case raises yet further difficulties.  E. Ransom & R. Sneckenberg, *FEATURE COMMENT: Speak Now Or Forever Hold Your Protest: Intervenor's Silence Waives Future Protest Grounds*, 63 No. 15 Government Contractor ¶ 107 (Apr. 14, 2021) ("Does this mean an awardee must, while defending its award, preemptively challenge every negative finding about its own proposal—e.g., every weakness, every negative comment about its past performance, every arguably too-low adjectival rating— as well as assert every possible additional weakness or negative comment that the protester's proposal may have warranted? One would hope not, as doing so could needlessly complicate protests and result in a significant waste of resources on protective challenges never intended to

almost immediately, filing its original complaint here within a week, on March 4, 2021. That is a far cry from the factual scenario in *COMINT*, in which the plaintiff "had two and a half months between the issuance of Amendment 5 and the award of the contract in which to file its protest[,]" which the Federal Circuit held "was more than an adequate opportunity to object" and where the consequence of a successful protest would have been to "restart the bidding process." *COMINT*, 700 F.3d at 1383.  Here, there is no point at which VS2 unduly delayed pursuing its claim – let alone by any duration approaching two and half months – nor does VS2 seek an order restarting the bidding process.  *ATSC Aviation*, 141 Fed. Cl. at 696 (rejecting application of *Blue & Gold* waiver rule and noting that plaintiff's "protest, if successful, would neither restart the bidding process nor interrupt a contract execution").

Similarly, in *Inserso*, the Federal Circuit concluded that the plaintiff in that case could have objected to the terms of the solicitation *before proposals were even due*.  *Inserso*, 961 F.3d at 1352 ("Had Inserso objected to the solicitation before the submission of final proposals, raising its concern that some bidders might have received information by participating in the full-and-open competition, DISA could have confirmed that an unequal disclosure occurred and provided the non-proprietary debriefing information to all bidders in the small-business competition.").  In marked contrast, VS2's action in this Court, challenging the Agency's corrective action (and the subsequent contract award), could not have been raised "before the submission of final proposals."  *Id.*

Although both Vectrus and the government invite "the Court to weigh the totality of the circumstances," Oral Arg. Tr. 90:2-4, in deciding whether to hold VS2's claims here waived pursuant to *Blue & Gold*, the Court concludes that, aside from the limited circumstances in which the Federal Circuit has done otherwise, any waiver doctrine should be applied in narrowly defined circumstances: in particular, where a prospective plaintiff can determine a precise filing deadline for its complaint.  A "totality of the circumstances" test is not predictable or workable and, most importantly, not required by the Federal Circuit.  That said, the "totality of the circumstances" are appropriately considered – pursuant to 28 U.S.C. § 1491(b)(3) – in terms of the propriety of injunctive relief in any given case.  In declining to find VS2's action here waived, the Court is not suggesting that timing issues are irrelevant.  Rather, all the Court holds is that the *Blue & Gold* waiver rule does not apply here. To the extent that the timing of VS2's protest may have an insalubrious impact on the procurement process, that is a question for this Court to consider with regard to permanent injunctive relief, but does not require the Court to find VS2's claims waived.

be litigated. . . . *VS2* does not seem to go so far, as it emphasized the unique evaluation scheme and the threshold standing and jurisdictional issues that could have been raised. Going forward, however, these waiver issues are considerations that counsel for intervenors will have to make[.]").

## VI.   GAO'S *VECTRUS* DECISION IS ERRONEOUS AS A MATTER OF LAW

As described above, GAO, in sustaining Vectrus's protest, concluded that where "a firm offers a cap or ceiling on a particular cost that effectively limits the government's liability and shifts liability for the cost to the offeror, any upward adjustment to the capped cost is improper." AR 6391 (citing *Affordable Engineering Services, Inc.*, B-407180.4, 2015 CPD ¶ 334, 2015 WL 7450123 (Aug. 21, 2015)). Rather, according to GAO, "the only appropriate consideration for the agency is whether the offeror may be found responsible in light of the proposed assumption of liability." *Id.* In this case, GAO determined that the Agency "made what amounts to two unwarranted assumptions: first that Vectrus was not actually offering what it had proposed; and second, that Vectrus was not financially capable of absorbing the cost savings it had proposed, even though there is nothing in the record to show that the agency ever made a responsibility determination with respect to Vectrus." *Id.* Accordingly, GAO held that "the agency improperly added $19,719,898 to the Vectrus cost/price proposal for evaluation and source selection purposes" and that, "absent the agency's error, Vectrus offered the lowest evaluated cost/price among the three competitive range offerors[.]" *Id.*

Instead of recommending that the Agency *both* reevaluate its award decision "absent the agency's evaluation error" (*i.e.*, after removing the cost adjustment) *and* consider the assessed performance risk triggered by the proposed cost absorption, GAO "recommend[ed] that the agency issue the task order to Vectrus as the apparent low-cost/price acceptable offer[]" – thereby effectively flipping the award. AR 6392; *see also* AR 6766-67 (GAO explaining its earlier decision "that Vectrus was entitled to receive the task order based on the express terms of the RFP"). In GAO's view, "[a]ny question concerning a firm's ability to perform the contract in light of a capped cost that is below the actual cost is a matter of the firm's responsibility." AR 6771 (citing GAO decisions).

VS2 argues that the Agency improperly switched awardees due to a flawed GAO decision that, in effect, "irrationally foisted back onto the Army the risk from Vectrus's Business Policy Decision that the Army had reasonably identified and taken measures to mitigate." Pl. Resp. at 13. According to VS2, "[t]he result was a near-bright-line rule that barreled over considerations such as the Solicitation's instructions and whether the Army even found the absorption desirable or feasible." Pl. MJAR at 26. The Court agrees with VS2 and concludes that GAO's decision was erroneous as a matter of law, that the Agency thus irrationally reversed its position based upon GAO's decision, and that the resulting contract award to Vectrus failed to comply with the Solicitation.

To understand where, in the Court's view, GAO and the Agency went wrong, the Court must first explain the rationale underlying the FAR's requirement for a cost realism analysis generally, as well as the specific implications of the analysis performed in this case.

The FAR defines the term "Cost realism" as meaning that an offeror's proposed costs:

> (1) Are realistic for the work to be performed;
>
> (2) Reflect a clear understanding of the requirements; and
>
> (3) Are consistent with the various elements of the offeror's technical proposal.

FAR 2.101.  The requirement to conduct a cost realism analysis is contained in several FAR provisions.  FAR 15.305, for example, provides that "[w]hen contracting on a cost-reimbursement basis, evaluations shall include a cost realism analysis to determine what the Government should realistically expect to pay for the proposed effort, *the offeror's understanding of the work, and the offeror's ability to perform the contract*."  FAR 15.305(a)(1) (emphasis added).  Similarly, FAR 15.404-1 provides that "[c]ost realism analysis" is used "to determine whether the estimated proposed cost elements are realistic for the work to be performed; *reflect a clear understanding of the requirements*; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal."  FAR 15.404-1(d)(1) (emphasis added).

The Solicitation reflected the FAR's requirements for a cost realism analysis in numerous provisions.  Section M.4 ("Evaluation Methodology"), for example, provides that "[t]he Cost/Price Factor will be evaluated for cost realism and price reasonableness."  AR 145 (RFP § M.4.1).  The Solicitation further provides:

> The proposal must clearly and unambiguously reflect the Offeror's intended approach and establish cost credibility. Any inconsistency, whether real or apparent, between promised performance and proposed cost must be adequately explained in the proposal. An offeror's failure to adequately explain an inconsistency between promised performance and cost may result in a finding of Technical Unacceptability or a finding that a proposed cost is unrealistic for the work to be performed.

AR 145 (RFP § M.4.2); *see also* AR 125 (RFP § L.4.1.3), AR 135 (RFP § L.5.4.1.3), AR 135-136 (RFP § L.5.4.1.6 (requiring that "[t]he cost/price proposed must be consistent with the Offeror's Technical Proposal" and cautioning that while "[c]onsistency between the Offeror's Cost/Price and Technical Proposals reflects the Offeror's ability to perform the effort required at the proposed amount[,]" "[a]ny significant inconsistencies, if not adequately explained in the proposal, raise a fundamental question as to the Offeror's inherent understanding of the work required and its ability to perform the contract")).

There are a number of other references to cost realism in the Solicitation.  *See, e.g.*, AR 145-46 (RFP § M.4.4.2) ("The Cost/Price Factor will be evaluated for price reasonableness and cost realism, but it will not be assigned an adjectival rating."). Section M.5.3.2 specifically covers "Cost Realism Analysis" and, reflecting the FAR's language, provides that it "is the process of independently reviewing and evaluating specific elements of the Offeror's proposed cost elements to determine the following: whether the estimated proposed cost elements are realistic for the work to be performed; whether the proposed cost elements reflect a clear understanding of the requirements; and whether the proposed cost elements are consistent with the unique methods of performance described in the Technical Proposal."  AR 149.

Of particular significance here, the Solicitation warned offerors "that the Government has concerns with the potential for post-award performance problems if Offerors propose unrealistically low costs" and that "[t]herefore, the Government reserves the option of rejecting a proposal if, in the exercise of its judgment, it determines that an Offeror's cost proposal is unrealistically low, regardless of technical merit and/or evaluated costs."  AR 149 (RFP § M.5.3.2.1).  Indeed, the Solicitation contemplated precisely what happened in this procurement:

> For example, if as a result of the Cost Realism analysis it becomes clear to the Government that *any necessary upward MPC adjustments are so substantial that they present an unacceptable risk* (notwithstanding an assessed rating of acceptable under the technical factor), the proposal may be rejected and not further considered for award. Therefore, failure of the Offeror to establish the credibility of its proposed costs may result in a MPC adjustment being made to the costs proposed, ***and/or the proposal being rejected as unrealistically low and not further considered for award***.

*Id.* (emphasis added).

Thus, pursuant to both the FAR and the Solicitation, there are two purposes of a cost realism analysis, necessitating distinct, albeit related, assessments.

*First*, "[t]he primary purpose of cost realism analysis . . . is to prevent offerors from gaining an advantage over competitors by proposing an unrealistically low estimated cost."  R. Nash & J. Cibinic, *Cost Realism Analysis in Negotiated Fixed Price Contracts: Confusion at the GAO or a New Limitation on Buy-Ins?*, 4 No. 10 Nash & Cibinic Rep. ¶ 61 (Oct. 1990).  The concern is that "[s]ince the contractor will be reimbursed on the basis of costs incurred, an offeror will not suffer economic consequences by proposing an estimated cost lower than its expected cost of performance.  Thus, the

proposal offering the lowest *estimated* cost may not necessarily be the proposal which will result in the lowest cost of *performance*." *Id.* (emphasis in original).[16]

*Second*, cost realism is "used to determine whether offerors *understand the contract requirements* and a finding of lack of understanding leads to downgrading of the proposal." R. Nash & J. Cibinic, *Cost Realism Analysis in Cost Reimbursement Contracts: What are the Rules of the Game?*, 5 No. 7 Nash & Cibinic Rep. ¶ 40 (July 1991) (emphasis in original).

Accordingly, and just as the Solicitation provides here, *see* AR 149 (RFP § M.5.3.2.1),[17] where an agency determines that an offeror's proposed or estimated cost is unrealistically low, an agency may not only make an upward "most probable cost" adjustment – referred to as an "MPC" – but also may determine that the offeror's proposal represents an unacceptable risk to performance.

But, what about a case in which an offeror proposes to cap its costs? While an offeror may, indeed, propose contractually binding cost caps to avoid an upward MPC adjustment, the offeror cannot rely upon such caps to escape the required risk assessment. That is because where an offeror proposes to cap its cost for one or more cost-reimbursement CLINs, the offeror effectively converts them to firm-fixed price CLINs (*i.e.*, where the actual costs of expected performance are otherwise projected to exceed the cost cap).[18] In such a case, the FAR's concern is that the selected contractor ultimately will attempt to achieve profitability via substandard performance; a cost realism analysis must assess that risk. *Advanced Tech. Sys., Inc.*, B- 215124, 85-1 CPD ¶ 315, 64 Comp. Gen. 344, 348 (Mar. 18, 1985) ("Assuming that higher skilled, and presumably higher paid, contractor personnel can perform tasks at a higher speed, we think that a contractor, who submitted unrealistically low proposed costs, would be forced by the caps to propose less skilled, lower paid and slower personnel in order to stay within the ceilings."); *cf.* R. Nash & J. Cibinic, *Cost Realism Analysis in Negotiated*

---

[16] Put differently, "cost realism analysis is . . . used as a means of determining the probable cost of performance of the work proposed by offerors and *this probable cost* is being used as the evaluation factor in making the source selection decision." R. Nash & J. Cibinic, *Cost Realism Analysis in Cost Reimbursement Contracts: What are the Rules of the Game?*, 5 No. 7 Nash & Cibinic Rep. ¶ 40 (July 1991) (emphasis in original).

[17] "'Interpretation of [a bid] solicitation is a question of law' that is reviewed de novo." *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1309 (Fed. Cir. 2016) (quoting *Banknote*, 365 F.3d at 1353).

[18] *Vitro Corp.*, B- 247734, 92-2 CPD ¶ 202, 1992 WL 251700, *5 (Sept. 24, 1992) ("a cap, by definition, converts at least some portion of a cost-type contract to a fixed-price contract"); *Halifax Tech. Servs., Inc.*, B-246236, 94-1 CPD ¶ 30, 1994 WL 20801, *7 (Jan. 24, 1994) ("[S]ince the effect of a cap like the one here is to convert a portion of this cost-type contract to a fixed-price contract, . . . we agree that [a cost] cap may be analogous to a below-cost bid or offer in a fixed-price environment.").

*Fixed Price Contracts: Confusion at the GAO or a New Limitation on Buy-Ins?*, 4 No. 10 Nash & Cibinic Rep. ¶ 61 (Oct. 1990) ("In fixed price contracts, the purpose to be served by conducting a cost realism analysis is to protect the Government from encountering problems in performance caused by awarding a contract based on an unrealistically low price. . . . Award of a contract at an unrealistically low price should only be made with a knowledge of the risks involved."); V. Edwards, *Price Realism: A Primer*, 28 Nash & Cibinic Rep. NL ¶ 1 (Jan. 2014) ("There are two parts to price realism analysis: (1) the analysis done to determine whether the proposed price is high enough to cover the cost of performance and (2) the assessment of the risk arising from a below-cost price and the effect of that risk on nonprice value.").[19]

In this case, the Agency, during discussions, expressed significant concerns with the lack of consistency between Vectrus's (and its proposed subcontractors') cost/price and technical volumes. *See, e.g.*, AR 2853-58 (EN 1 & EN 2); AR 2868-75 (EN 7 – EN 9). In response, Vectrus submitted questions to the Agency, including several to better understand the Agency's view of Vectrus's proposal to cap [*  *] FTEs at a cost to the government of $[*  *] per hour. AR 2886. In particular, Vectrus asked:

> (a) If adequately explained by Vectrus in our revised Assumptions narrative and Cost/Price model, is it an acceptable Business Policy Decision to propose a selected number of FTEs that will be invoiced to the Government at the deep discount described above (and recognizing

---

[19] V. Edwards, *Price Realism: A Primer*, 28 Nash & Cibinic Rep. NL ¶ 1 (Jan. 2014) ("Note that FAR does not use the term *price realism*, but that in common usage a cost realism analysis performed in a fixed-price acquisition is called a *price realism analysis*. . . . In short, cost realism analysis is done in cost-reimbursement acquisitions to determine whether a proposed estimated cost is unrealistically low and, if so, what it really should be. Price realism analysis is done in fixed-price acquisitions to determine whether a price is unrealistically low and to what degree, and to figure out why it is low so that risk can be properly assessed."). Thus, for example, and by way of analogy, the FAR generally discourages the use of uncompensated overtime and provides that contracting officers:

> [M]ust ensure that the use of uncompensated overtime in contracts to acquire services on the basis of the number of hours provided will not degrade the level of technical expertise required to fulfill the Government's requirements (see 15.305 for competitive negotiations and 15.404–1(d) for cost realism analysis). When acquiring these services, contracting officers must conduct a risk assessment and evaluate, for award on that basis, any proposals received that reflect factors such as: (1) Unrealistically low labor rates or other costs that may result in quality or service shortfalls[.]

FAR 37.115-2.

> that Vectrus would still compensate all employees IAW the SCA and CBAs?
>
> (b) With regard to (a) above, is it also an acceptable Business Policy Decision to propose to forgo hiring such deeply discounted FTEs, with the understanding that: (1) mission support would not be negatively impacted, (2) we are basing our Business Policy Decision on documented, historical experience providing equivalent support at Fort Bragg, and (3) should Vectrus at some point need to hire any or all of these FTEs that Vectrus would bear the full cost of compensating such employees IAW the SCA or CBA[s]?

AR 2886 (Question #2).

The Agency answered Vectrus's questions, expressing, in the process, several concerns regarding the implications of Vectrus's proposed approach to the ENs. For example, the Agency noted that while Vectrus "has proposed a cost credit [that] well exceeds the amount of fee proposed[,]" it "has not established cost credibility and/or shown that the proposed costs are realistic for the promised performance." AR 2887. The Agency further observed that there was an apparent "inconsistency between the promised performance in the technical volume and the costs proposed[.]" *Id.* The Agency particularly focused on the fact that the offeror suggested "forgoing the hiring of these [*   *] FTE[s]." *Id.* With respect to question (b), above, the Agency responded in the negative (and in no uncertain terms). *Id.* ("No, Offerors are required to meet the minimum requirements of the RFP.").

In addressing the ENs in a new "Cost/Price Volume IV," Vectrus revised its "Cost proposal so that the staffing priced in the Cost/Price Volume now aligns with the staffing in the Technical Volume . . . ." AR 4400. In particular, Vectrus "adjusted [its] Cost proposal to reflect that the SCA/CBA labor rates . . . are in accordance with . . . the RFP by increasing the labor rate . . . from $[*   *] to the full CBA wage." *Id.*; *see* AR 4401 ("Vectrus further acknowledges that all employees will be paid the SCA/CBA labor rate as published in the current SCA/CBA."). Instead of proposing select labor rates reduced to near zero, Vectrus instead made a "Business Policy Decision" in the form of "a cost-reduction benefit to the Government, wherein Vectrus [proposed to] absorb[] a portion of the costs, and the associated financial risk." AR 4401. Thus, according to Vectrus, "there is no disconnect between our Cost/Price Volume and Technical Volume." *Id.* Vectrus asserted that "[t]o absorb these costs internally, Vectrus will use our Corporate proceeds." *Id.*; *see* AR 4402 ("Vectrus is a financially sound and transparent publicly traded corporate with a strong cash position; as such, our company is fully capable of absorbing the cost of this Business Policy Decision."); *see also* AR 4404

("Vectrus formally acknowledges and accepts the risks and responsibilities associated with this decision."). Vectrus assessed a total cost reduction of more than $22 million.[20]

Notwithstanding Vectrus's apparently bald assertion that its Business Policy Decision "will not impact our operational approach to managing and executing the . . . PWS technical requirements and achieving the associated . . . performance standards[,]" AR 4421, the Agency's cost realism analysis reasonably reached a different conclusion. *See* AR 5536-5568. That analysis "determined the proposed Business Policy Decision Cost Credit to be unrealistic for this effort" for several reasons. AR 5566. First, the Agency was reasonably concerned about whether Vectrus intended to "forgo[] hiring the [* * *] FTE[s] associated with [the] Cost Credit proposed[,]" noting that "[t]his creates an inconsistency with the technical volume" and that such a "significant" inconsistency "raise[s] a fundamental question as [to] the Offeror's inherent understanding of the work required and its ability to perform the contract." *Id.* In that regard, the Agency's cost realism analysis correctly cited section M.5.3.2.1 of the RFP in assessing "the potential for post-award performance problems if Offerors propose unrealistically low costs." *Id.* Second, and in line with that same Solicitation provision, the Agency reasonably concluded that Vectrus's Business Policy Decision posed risks of performance problems: "If the Offeror does in fact plan on forgoing the hiring of [* * *] FTE[s] . . . *this poses a risk to the government and a concern for post-award performance problems*." *Id.* (emphasis added). Third, the Agency found "the proposed credit unrealistic as it would not be covered by the Offeror's proposed fee if issues arose during execution." *Id.* This, too, is properly understood as a concern with performance risks, as the point is that the proposed credit – or cost caps – likely will place Vectrus in a significant loss position unless Vectrus negatively adjusts its performance to stay profitable, hardly an unreasonable or far-fetched concern.

To account for the risks of the Business Policy Decision, the Agency made "a probable cost adjustment . . . in the amount of the entire credit, $17,839,964." AR 5566; *see* AR 5589 ("Vectrus [sic] proposal contained a discount labeled as a Business Decision Cost Credit that exceeded the fee from the entire contract. It was determined that the Government needed a Probable Cost Adjustment to make their offer more realistic.").[21]

---

[20] To avoid an upward MPC adjustment for Vectrus's subcontractors, Vectrus instructed them "to remove its proposed labor rate discounts and instead fully price" FTEs "by pricing each FTE in accordance with the applicable CBA and the pricing guidance in the solicitation." AR 4411; *see also* 4408 (noting that "the total amount proposed by DA Defense has increased from a five-year total of $[* * *] to $[* * *]" and asserting that "this resolves this EN and precludes an MPC adjustment by the Government").

[21] There were two upward cost adjustments to Vectrus's proposal for a total amount of $19,719,898. AR 6385 ("The principal upward adjustment was in the amount of $17,839,964 . . . to account for certain costs that Vectrus had proposed to absorb . . . during the primary base and option periods of performance" while "[a] second, smaller, upward adjustment was made in the amount of $1,879,933 . . . to account for the same costs, but was allocable to a 6-month

The upward MPC adjustment is not itself at issue here, as the Court agrees with GAO that the Agency erred in initially making that adjustment.  That is because, as GAO correctly explained, "where a firm offers a cap or ceiling on a particular cost that limits the government's liability and shifts liability for the cost to the offeror – and no other issue calls into question the effectiveness of the cap – any upward adjustment to the capped cost is improper."  AR 6386.  GAO, however, further concluded – incorrectly – that "[a]ny question concerning a firm's ability to perform the contract in light of a capped cost that is below the actual cost is a matter of the firm's responsibility rather than a matter to be considered by the agency in its cost realism evaluation."  *Id.*  Regarding that second conclusion, the Court holds that GAO erred as a matter of law.

As demonstrated above, the FAR's required cost realism analysis involves the assessment of performance risk, particularly where an offeror proposes to cap its costs such that it risks incurring a significant loss.  In other words, where an agency determines that an offeror's proposed costs are unrealistically low for the contemplated performance, the agency must account for that assessment in at least two ways: the agency must consider whether to adjust the proposed costs upwards for evaluation purposes, and it must consider whether the proposed costs are indicative of performance risk.  *See* AR 149 (RFP § M.5.3.2.1).

With respect to an MPC adjustment, the agency cannot simply accept the offeror's proposed costs because, as GAO explained, "an offeror's proposed costs are not dispositive in a cost-reimbursement environment since, regardless of the costs proposed, the government generally will be liable to the contractor for all allowable and allocable costs incurred in connection with the performance of the contract."  AR 6386.

But the risk of higher costs during performance is not the FAR's only concern.  Thus, an agency must assess not only whether an MPC adjustment is necessary to cure unrealistically low proposed costs but also – as GAO itself acknowledged in passing in this case – whether such unrealistically low costs reflect a deficiency in the offeror's "understanding of the requirements."  AR 6385 (citing FAR 15.404-1).  Where an offeror agrees to cap costs during performance and suggests the possibility of having to absorb a significant loss, an agency cannot ignore potential performance risks; if anything, an agency's concerns should be exacerbated.  That is exactly what occurred here: the Agency raised distinct concerns about Vectrus's performance risk.  *See* AR 6385 (GAO's acknowledging the Agency's concern that Vectrus's "assumption of liability would be borne out during contract performance, especially in view of the fact that the amount of the costs to be absorbed by Vectrus exceeded the amount of the firm's proposed fee").  GAO's ultimate decision and recommendation, however, all but compelled the Agency to ignore those findings in the administrative record.  *See* AR 6392.

---

optional extension to the period of performance[.]").

Moreover, while GAO 's decision at issue in this case relied upon *Affordable Eng'g Servs., Inc.*, B-407180.4, 2015 CPD ¶ 334, 2015 WL 7450123 (Aug. 21, 2015), VS2 correctly observes that GAO erroneously omitted a key aspect of that precedent.  Pl. MJAR at 26-27 ("The result was a near-bright-line rule that barreled over considerations such as the Solicitation's instructions and whether the Army even found the absorption desirable or feasible.").  In *Affordable Engineering*, the protester ("AES") argued that "the Navy's cost realism analysis was improper because it failed to consider the performance risk associated with [the awardee's] proposing indirect rate caps that could result in a loss contract."  *Affordable Eng'g*, 2015 WL 7450123 at *4.  In rejecting AES' argument, GAO explained as follows:

> Our Office has long held that as a general matter, a decision about an awardee's ability to perform a contract at rates capped below actual costs is a matter of an offeror's responsibility.  *See, e.g., Highmark Medicare Servs., Inc., et al.*, B–401062.5 et al., Oct. 29, 2010, 2010 CPD ¶285 at 28; *MCT JV, supra*, at 13.  It is only where a solicitation provision expressly instructs offerors not to submit unrealistically low costs that the risk stemming from an offeror's decision to propose capped rates is a matter for the agency's consideration in the context of its evaluation of proposals and source selection decision process.  *See MCT JV, supra.*

*Id.* at *4-*5 (footnote omitted) (discussing *MCT JV*, B-311245.2, 2008 CPD ¶ 121, 2008 WL 2907033, *12-*13 (May 16, 2008)).  GAO further distinguished "the solicitation at issue" in *Affordable Engineering* as "not contain[ing] any of the express and unique warnings and language set forth in the solicitation at issue in *MCT JV*."  *Id.* at *5 (noting that "AES has not alleged that the RFP contained any express warnings or instructions not to submit unrealistically low costs as were present in *MCT JV*").  Thus, GAO "disagree[d] with AES that the agency was required to consider the performance risk associated with [the] capped indirect rates, and [found] that the agency properly treated the matter of [the] indirect rate caps as a matter of responsibility."  *Id.*  In GAO's *Vectrus* decision at issue here, none of that language from *Affordable Engineering* is mentioned, let alone applied.  AR 6386-92.

Contrary to GAO's decision in *Vectrus*, GAO's *Affordable Engineering* decision simply does not stand for the proposition that "[a]ny question concerning a firm's ability to perform the contract in light of a capped cost" is *per se* only "a matter of the firm's responsibility rather than a matter to be considered by the agency in its cost realism evaluation."  AR 6386 (citing *Affordable Eng'g*, 2015 WL 7450123 at *6).  The Court is at a total loss as to how GAO in *Vectrus* extracted such a *per se* rule.

To make matters worse, GAO's decision in *MCT JV* demonstrates, if anything, that GAO erred in *Vectrus*.  In *MCT JV*, the awardee similarly proposed cost or rate

caps, and GAO correctly held that "when offerors propose such caps, and no other issue calls into question the effectiveness of the cap, upward adjustments to capped costs are improper."  *MCT JV*, 2008 WL 2907033 at *10.  On the other hand, GAO concluded:

> [T]he agency could not simply ignore the risk presented by these capped rates in concluding that [the awardee's] proposal was the best value. As noted previously, the solicitation expressly admonished offerors not to propose unrealistically low costs because of [the Navy's] concern that a proposal with unrealistically low costs due to an offeror's decision to submit a proposal below its anticipated costs "may cause problems for the Navy as well as the contractor during contract performance."

*Id.* at *11 (quoting the RFP at issue in that case).  While the Navy argued that the awardee's "ability to perform at its capped rates was solely a matter concerning [its] responsibility," GAO rejected that argument, holding that "where, as here, the solicitation expressly instructs offerors not to submit unrealistically low costs or prices, the risk stemming from an offeror's decision to propose unrealistically low capped rates is a matter for the agency's consideration in the context of its evaluation of proposals and source selection decision process."  *Id.*  Accordingly, GAO determined that the agency erred in failing to consider the awardee's "capping of its rates in that context" as "inconsistent with the terms of the solicitation."  *Id.*

Critically, the RFP language upon which GAO relied in *MCT JV* is **nearly identical to the Solicitation language contained in the RFP at issue in this case**. *Compare MCT JV*, 2008 WL 2907033 at *3 ("[A] contract awarded to a contractor submitting an unrealistically low cost/price proposal (whether resulting from a decision on the part of the contractor to submit a price below anticipated costs ... or other circumstances) may cause problems for the Navy as well as the contractor during contract performance.... Accordingly, Offerors are cautioned that SHOULD THE GOVERNMENT, IN THE EXERCISE OF ITS JUDGMENT, DETERMINE THAT A COST PROPOSAL SUBMITTED IN RESPONSE TO THIS SOLICITATION IS UNREALISTICALLY LOW, THE GOVERNMENT MAY REJECT THE PROPOSAL, REGARDLESS OF ITS TECHNICAL MERIT AND/OR EVALUATED COST TO THE GOVERNMENT." (capitalization in original)), *with* AR 149 (RFP § M.5.3.2.1) (warning offerors "that the Government has concerns with the potential for post-award performance problems if Offerors propose unrealistically low costs" and that "[t]herefore, the Government reserves the option of rejecting a proposal if, in the exercise of its judgment, it determines that an Offeror's cost proposal is unrealistically low, regardless of technical merit and/or evaluated costs"); *see also* Oral Arg. Tr. 13:9-10 (government agreeing that RFP § M.5.3.2.1 "is substantially similar" to the solicitation language at issue in GAO's  *MCT JV* decision); *id.* at 14:24-25 – 15:2 ([Government

Counsel]: "We do think that the solicitation provision in *MCT JV* is much closer the solicitation provision in this case.  In *Affordable*, there was not . . . a very similar situation.").[22]

The Court rejects, as a matter of law, the *per se* rule articulated in GAO's decision in *Vectrus* that would limit an agency's consideration of cost or rate caps only under the rubric of responsibility.  Such a rule is inconsistent with the FAR's plain language – not to mention of the primary purposes of a cost realism analysis – and improperly restricts an agency with otherwise reasonable concerns about the impact of cost caps upon performance.  The Court further finds that the Solicitation at issue in this case is nearly identical to the RFP language at issue in the *MCT JV* decision and, thus, at a minimum, it was irrational for GAO to ignore its own compelling reasoning in *MCT JV*.

GAO in *Vectrus* further concluded that the Agency erred in making "an unwarranted assumption about what Vectrus might do during performance based on the informal – clearly non-binding – exchange with Vectrus . . . that occurred during discussions."  AR 6389.  According to GAO, the Agency's assumption was "directly contradicted by the actual contents of the Vectrus revised proposal."  *Id.; see also* AR 6390 (GAO concluding that the Agency "erred in making an unwarranted assumption about Vectrus's potential behavior during contract performance that was directly at odds with the contents of Vectrus's proposal").  But GAO's determination that "[i]t necessarily follows that this rationale does not provide a reasonable basis for the application of the upward cost adjustment" is a non-sequitur because the assessed probable cost clearly was not the only concern the Agency articulated.  AR 6390.  Rather, the Agency was reasonably concerned about Vectrus's performance risk due to the cost caps.

If anything, GAO erroneously concluded that Vectrus's proposal somehow committed Vectrus, during performance, to hire all of the FTEs for which Vectrus originally proposed [* * *] costs and then – when the Agency challenged that strategy during discussions – proposed a cost cap to mitigate the impact of the actual costs of those same FTEs.  The Agency's assessment of whether such cost caps would incentivize Vectrus to simply cut corners during performance in order to avoid the caps – and thereby maintain profitability – was not only reasonable but permitted pursuant to the FAR, the terms of the Solicitation, and GAO's own precedent.  That is particularly true given the government's admission that "there is no actual requirement [for Vectrus] to use all" of the proposed FTEs.[23]  Oral Arg. Tr. 29:15-17.  That is precisely the

---

[22] Vectrus's counsel, at oral argument, posited that the salient provision in *MCT JV* is distinguishable because it "was stated in all caps and it was [thus] very explicit."  Oral Arg. Tr. 86:13-16.  The Court will not apply a different rule depending upon whether or not applicable solicitation language is written in a certain font or style.

[23] "'[A] lawyer's statements may constitute a binding admission of a party[ ]' if the statements are 'deliberate, clear, and unambiguous[.]'"  *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 347

concern the Agency had – *i.e.*, that, as government counsel conceded, if Vectrus "do[es]n't hire those . . . [*  *  *] FTEs, *and their performance is still satisfactory*, then *maybe* they don't have to absorb that cost after all…." *Id.* at 30:3-5 (emphasis added). Both Vectrus and now the government are trying to have their cake and eat it too, but neither adequately reconciles the idea that Vectrus will perform at the required level – consistent with the government's response to Vectrus's EN question, *see* AR 2887 – and the fact that nothing compels Vectrus to do so, a problem compounded by the negative financial incentive of the proposed cost caps.[24]

The basic point is straightforward. When an offeror proposes unrealistically low costs for a particular performance, the agency must consider whether it will actually obtain such low costs during performance or whether the offeror has proposed low costs because it does not in fact understand the work to be performed. The first question goes to cost risk, the second to performance risk. When, on the other hand, an offeror projects costs realistically, but then agrees to cap the costs actually billed to the government, the cost risk itself may go away (*i.e.*, an upward MPC adjustment is improper), but the performance risk either remains or is even amplified. GAO's decision in *Noblis, Inc.*, B-414055, 2017 CPD ¶ 33, 2017 WL 549174 (Feb. 1, 2017), is particularly instructive. In that case, the protester argued "that it was improper for the [source selection authority] to consider performance risk beyond making a cost realism adjustment." *Id.* at *11. In particular, the protester complained "that the agency penalized it twice when it upwardly adjusted the protester's proposed costs to account for the firm's low labor rates and when the SSA considered the firm's low labor rates as evidence of the protester's performance risk." *Id.* In the protester's view, the agency's cost adjustment "eras[ed] any risk in [the protester's] alleged low labor rates." *Id.* GAO disagreed, concluding that "[t]he agency's upward adjustment of Noblis' proposed costs did not erase the performance risk associated with low labor rates. As provided for in the solicitation, the agency used the results of the cost analysis to consider performance risk." *Id.* If an upward MPC adjustment does not erase performance risk, *a fortiori* such risks remain – if, indeed, they are not exacerbated – where, as here, no

_____

(4th Cir. 2014) (quoting *Fraternal Order of Police Lodge No. 89 v. Prince George's Cty., Md.*, 608 F.3d 183, 190 (4th Cir. 2010)); *see Checo v. Shinseki*, 748 F.3d 1373, 1378 n.5 (Fed. Cir. 2014) (questioning the Veterans Court's "reluctance to accept [a] concession" made at oral argument and citing case law for the proposition that admissions are generally binding on the parties); *see also Chemehuevi Indian Tribe v. United States*, 150 Fed. Cl. 181, 204 (2020).

[24] Oral Arg. Tr. 31:4-14 (government counsel agreeing with the Court that "there is evidence in the record that the government believed it was a performance risk to not hire the [*  *  *] FTE, or maybe because of the fact that there is no requirement, per se, to hire the [*  *  *] . . . because the government doesn't dictate the way the plaintiff performs the contract, the concern is that the way you get profitable is by cutting corners"); *see also id.* at 32:3-6 (government counsel agreeing that the cost realism analysis found that, "if the offeror does, in fact, plan on foregoing the hiring [of] [*  *  *] FTEs, . . . that this could pose a risk to the government and the concern for post-award performance problems").

upward adjustment is permitted, and the offeror essentially proposes to perform the contract at a significant loss.

While GAO effectively tied the Agency's hands in recommending that a new award be made to Vectrus, the government argues that "here, the Army *did* consider the risk stemming from Vectrus's proposed cost absorption and did not consider it necessary to remove Vectrus from the competition for unacceptable performance risk." Def. MJAR at 24 (emphasis in original) (citing AR 5958). There are at least three problems with that contention. The first is the government's citation in support of that assertion: the cite is to the Agency's GAO brief. *Id.* The government (correctly) conceded at oral argument that the GAO brief constitutes non-contemporaneous, *post hoc* documentation, *see* Oral Arg. Tr. at 18:21-23, and thus the Court would discount it even if it tended to support the government's position, which it does not. The second problem, in that regard, is that while the Agency in its GAO brief asserted that "Vectrus has not shown that the Army removed Vectrus from the competition for unacceptable performance risk[,]" AR 5958 – which apparently is the part of the brief the government intended to rely upon, *see* Oral Arg. Tr. at 19:1-6 – that merely begs the question whether the Agency *would have* removed Vectrus from the competition for unacceptable performance risk in lieu of the MPC adjustment that GAO found improper (and concluded could be considered only under responsibility). Indeed, on the very same page of the Agency's GAO brief, the Agency asserts that it made the adjustment, in part, as a measure of, or to compensate for, performance risk. AR 5958 (Agency noting several concerns with Vectrus's proposal, including that the "acceptance of a loss 'would not be covered by the Offeror's proposed fee if issues arose during execution[,]'" and that its "concerns were both supported by the procurement record and reasonable" (quoting AR 5566)). The third problem with the government's contention is that GAO's second decision in this matter undermines it entirely, insofar as GAO rejected VS2's argument "that the agency was required to take into consideration the risk that VS2 maintains is inherent in Vectrus's proposed approach to absorb some of the costs of performance." AR 6771. In other words, GAO implicitly concluded that the Agency did *not* take such risk into consideration when following GAO's recommendation to award the contract to Vectrus, and GAO explicitly concluded that the Agency did not have to do so. *Id.* (clarifying that, in its first decision, GAO held that capped costs may be considered only as "a matter of the firm's responsibility" and that [a]pplying that rule in the Vectrus case, we concluded that . . . in the absence of the upward cost adjustment, Vectrus was entitled to issuance of the task order under the express terms of the RFP").

The upshot is that, contrary to GAO's decisions in this procurement, the Agency must consider whether Vectrus may receive a contract award pursuant to Section M.5.3.2.1 of the Solicitation and any other applicable cost realism or related provisions, *e.g.*, AR 145 (RFP § M.4.2) ("An offeror's failure to adequately explain an inconsistency between promised performance and cost *may result in a finding of Technical*

*Unacceptability*" (emphasis added)).  In undertaking that analysis, the Agency must consider not only its previous cost realism findings already in the administrative record, but also the magnitude of the MPC adjustment to the Vectrus proposal that GAO correctly found that the Agency was not permitted to make when comparing the offerors' likely costs.  To the extent findings in the technical evaluation are inconsistent with the assessed performance risks, the Agency must revisit the former or otherwise reconcile the findings.

* * * *

Given the Court's conclusions above, and contrary to the government's argument, *see* Def. MJAR at 24, Federal Circuit precedent does not require that this Court simply defer to GAO's decision in *Vectrus* or the Agency's reliance upon it.  In that regard, the Court agrees with (now-Senior) Judge Wolski's decision in *CBY Design Builders v. United States*:

> What is different in cases when an agency follows a GAO recommendation is not that a decision is being reviewed for rationality, but *whose* decision matters in this review.  When the relevant procurement official (usually the contracting officer) decides to adopt the views of the GAO after a protest has been heard by that body, this agency decision is not considered inherently unreasonable (for departing from the agency's previous position) nor invulnerable (under the shield of GAO authority), but is instead measured by the rationality of the recommendation it follows.  Instead of deferring to the *initial* agency decision, and re-reviewing the protest that was brought in the GAO by scrutinizing the rationality of the initial decision, we defer to the *second* agency decision, and scrutinize the rationality of the GAO's resolution of the protest it heard.  But the review standard does not change because of the GAO's involvement.

105 Fed. Cl. 303, 339 (2012) (emphasis in original).  "Since the amount of deference given to an agency decision under the 'arbitrary and capricious' standard of review does not change when GAO denies a protest of the decision, or when GAO sustains a protest but its recommendation is not followed, it is hard to see how this deference would be altered by an agency's decision to follow a GAO recommendation." *Id.* at 340.  Thus, "[n]o 'special' amount of deference, covering questions of law as well as the ultimate decision being reviewed, can be gleaned from the three Federal Circuit precedents concerning the review of such corrective actions."  *Id.* (citing *Turner Constr.*, 645 F.3d at 1383–87, *Centech Grp., Inc.*, 554 F.3d at 1036-40, *Honeywell*, 870 F.2d at 647-49).

33

In sum, "one cannot conclude that the Court must defer to GAO's views on questions of law, such as the interpretation of a solicitation" or FAR provisions. *CBY Design Builders*, 105 Fed. Cl. at 340 (discussing *Honeywell*). As in *CBY Design Builders*, the Court "does not find the numerous references in opinions to the 'deference' to be given GAO decisions in the procurement area as supporting the ceding to GAO of our normal role in deciding questions of law." 105 Fed. Cl. at 341.[25]

To reiterate, the Court concludes that GAO's decision in *Vectrus* is erroneous as a matter of law insofar as GAO ignored binding FAR and Solicitation provisions, in addition to GAO's own precedent. While GAO correctly recommended that the Agency remove its upward MPC adjustment to Vectrus's proposal, GAO unreasonably recommended an award to Vectrus, essentially directing the Agency to ignore the performance risk the Agency reasonably already had assessed against Vectrus due to its proposed cost caps. GAO's recommendation that the Agency simply flip the award to Vectrus was, at a minimum, irrational and cannot stand. Finally, given the magnitude of the loss Vectrus may incur if it were awarded the contract – something GAO all but precluded the Agency from considering in the *Vectrus* decision – the Court concludes that the Agency must revisit and reconsider its "check-the-box" responsibility determination in light of the Court's findings, *supra*.[26]

─────────────────────

[25] As particularly relevant in this case, then-Judge Wolski correctly explained:

> There is nothing about interpreting a solicitation that makes it a question of law only in the hands of the Federal Circuit. Indeed, in *Banknote Corp.*, . . . the Federal Circuit explained that "judgment on the administrative record is often an appropriate vehicle" for our use—since protests "typically involve" such questions of law as "the correct interpretation of the solicitation issued," rather than disputes of material fact. *Banknote Corp.*, 365 F.3d at 1352. The Federal Circuit has described its "'task'" of "'address[ing] independently any legal issues, such as the correct interpretation of a solicitation,'" as part of its reapplication of the same APA standard used by our court in bid protests. *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1329 (Fed. Cir. 2004) (quoting *Banknote Corp.*, 365 F.3d at 1353). The Court concludes that it has the duty to determine independently any questions of law, such as the correct interpretation of a solicitation, that must be addressed in bid protests.

*CBY Design Builders*, 105 Fed. Cl. at 342.

[26] In ordering the Agency to revisit its responsibility determination, the Court agrees with the government that the Court should not "conduct its own determination of Vectrus's financial responsibility, an exercise within the purview of the agency, not the Court[.]" Def. Resp. at 7 & n.4. Moreover, although the lack of documentation in support of a responsibility determination ordinarily is not fatal to it, *see* Def. Resp. at 7 & n.4, Def. MJAR at 20-22, Def. Int. Resp. at 14-15,

### VII.   VS2 WAIVED ITS CHALLENGE TO VECTRUS'S LABOR CATEGORY SUBSTITUTIONS AND SUFFERED NO PREJUDICE IN ANY EVENT

VS2 argues that Vectrus improperly shifted required labor categories specified in the Solicitation "to lower-paying categories." Pl. MJAR at 34. As a result, according to VS2, "the Army should have rejected Vectrus's proposal as an unacceptable deviation from the Solicitation's material terms or at least adjusted Vectrus's probable costs to erase the implausible savings." *Id.* (concluding that "[e]ither choice would have left VS2 as the lowest-price offeror and winner of the competition").

To be sure, VS2 – in its briefs and during oral argument – helpfully explained how Vectrus selected and substituted lower-cost labor categories in lieu of those specified in the RFP's spreadsheets that offerors were required to complete. Pl. MJAR at 35-37; Oral Arg. Tr. 59:4-61:9; AR 4598. While the Court agrees that a number of RFP provisions appear to preclude the substitution of specified labor categories with those of an offeror's choosing, *see, e.g.,* AR 129-30 (RFP § L.5.2.1.1(c)), AR 135 (RFP § L.5.4.1.2), Vectrus asserts that it only had to "propose[] the required minimum hours for the effort" but was otherwise free to alter the labor mix so long as its proposed staffing approach was adequately explained. Intv. Resp. at 19-22.

After reviewing the various relevant Solicitation provisions the parties cited, the Court concludes that, at a minimum, the RFP contained a patent ambiguity regarding whether offerors were permitted to make labor category substitutions. To the extent that the Agency ultimately decided that Vectrus's approach was permissible, VS2's challenge essentially seeks to vindicate its (now-)preferred reading of the Solicitation and, therefore, is untimely. *Blue & Gold*, 492 F.3d at 1313.

Moreover, the Court agrees with Vectrus that "if what [it] did was impermissible, then VS2's own proposal did the impermissible" as "VS2 ***also*** proposed variations to the staffing requirements outlined in [the RFP's] TD-01 [spreadsheet]." Intv. Resp. at 22 (emphasis in original) (citing AR 3118); *see also id.* at 24 (arguing that "VS2 casts stones in a glass house such that if Vectrus's approach shatters, so too must VS2's"). Indeed, VS2's counsel conceded during oral argument that VS2 likewise substituted certain labor categories for those specified in the Solicitation. *Id.* at 67:4-20. At least one such substitution was substantively indistinguishable from the approach Vectrus took. *Id.* at 68:25-69:4. VS2 responds that what matters is the degree of

---

the Court concludes that, given the specific facts of this case, the Agency must revisit its previous responsibility determination. In that regard, and notwithstanding the "wide discretion" afforded to a contracting officer's responsibility determination, *Impresa*, 238 F.3d at 1334–35 (quoting *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999)), pursuant to the APA standard of review, "[o]f course, a contracting officer's [decision] must be rational: the choice is committed to discretion, not whim." *DynCorp Int'l, LLC v. United States*, No. 2020-2041, 2021 WL 3744922, *7 (Fed. Cir. Aug. 25, 2021).

substitutions; that is, Vectrus did it more. *Id.* at 68:25-69:8. There is some facial appeal to VS2's point insofar as Vectrus appears, in fact, to have benefited from the substitution strategy a great deal more than VS2. But VS2's attempt to steal a base – that is, skipping over an essential (but faulty) premise of its argument – must be rejected. The simple fact is that VS2 cannot now complain about Vectrus's and the government's interpretation of the Solicitation when VS2 relied upon the very same interpretation when preparing its proposal. *Id.* at 71:19 – 74:5 (discussing VS2's substitutions).

Whether that defect in VS2's argument is characterized as waiver or lack of prejudice – either way – the Court rejects VS2's position with regard to labor category substitutions. *See Fairbanks Assocs.-Request for Reconsideration*, B-221374, 86-2 CPD ¶ 172, 1986 WL 63875, *5 (Aug. 11, 1986) ("Thus, it is clear from the record that the protester did not rely on its interpretation of the cost ceiling in calculating its proposed price. Accordingly, the protester's contention that it was prejudiced due to its interpretation of the cost ceiling is without merit."); *cf. Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986) ("Here it is obvious that in the preparation of its bid, which was accepted by the Government, Marden did not rely on an interpretation that composition or latex flooring was unnecessary in the mechanical rooms. Therefore, adherence to well established principles of contract law precludes the contractor's right to recover.").

Finally, Vectrus submitted the unrebutted expert declaration of Mr. Christopher W. Foux, a consultant with LitCon Group, LLC.[27] ECF No. 39-1. A certified public accountant, Mr. Foux was tasked with calculating an "[MPC] adjustment to Vectrus's proposed cost that would result from the Government determining Vectrus's first business policy decision . . . , which involved a change to the labor mix for [* * *] [FTEs], was inconsistent with the Solicitation's requirements." *Id.* ¶¶ 3, 5. Mr. Foux concluded "that the MPC adjustment to Vectrus's proposed cost would be $[* * *]. In other words, . . . if the Government determined Vectrus should not have implemented this change to the labor mix, the Government's MPC of Vectrus's total evaluated cost would have been $[* * *], which is [still] $[* * *] less than VS2's total evaluated cost." *Id.* ¶ 7 (footnote omitted). The Court finds Mr. Foux's analysis and calculations credible, and thus concludes that VS2 has failed to carry its burden to demonstrate that – even assuming VS2 should not have been permitted to lower its projected via less expensive labor substitutions – the outcome of the cost ranking had a substantial chance of being different. *Id.* ¶ 9. While VS2 claimed that "the cost impact to Vectrus's

---

[27] VS2 neither moved to strike the expert's opinion nor otherwise opposed the Court's consideration of it. *See FirstLine Transportation Sec., Inc. v. United States*, 116 Fed. Cl. 324, 326–27 (2014) (permitting expert declaration "not [to] substitute [his] judgment for the agency's judgment" but rather where the testimony contained "calculations based on data already contained in the administrative record, so that the Court can better understand the record"); *see also Naval Sys., Inc. v. United States*, 153 Fed. Cl. 166, 181 (2021).

proposal was $[*  *  *] [,]" the Court agrees with Mr. Foux that "[i]t is unclear how exactly VS2 calculated this" sum given that "VS2 did not include any supporting documentation or further explanation of how it computed $[*  *  *] figure, the assumptions it made, or the various elements it considered." *Id.* ¶ 11-12 (explaining that Vectrus itself erroneously claimed nearly $[*  *  *] in cost savings).

Given Mr. Foux's unopposed declaration, and the unrebutted analysis detailed therein, VS2 cannot demonstrate that it suffered prejudice either as a result of Vectrus's having proposed lower cost labor categories in lieu of those specified in the Solicitation or the government's acceptance of that approach. *Bannum*, 404 F.3d at 1358; *Info. Tech.*, 316 F.3d at 1319; *Alfa Laval*, 175 F.3d at 1367.

## VIII.   THE AGENCY REASONABLY EVALUATED VECTRUS'S PAST PERFORMANCE IN COMPLIANCE WITH THE SOLICIATION

VS2 alleges that "Vectrus was undeserving of a 'Substantial Confidence' rating [for past performance] because it has adverse past performance on two prior task orders." Am. Compl. ¶ 61.  VS2 thus asserts that "the Agency's decision to take corrective action by awarding to Vectrus was arbitrary and capricious because a reasonable evaluation of Vectrus's past performance would have kept Vectrus from being in line for award." *Id.*

In submitting information regarding the past performance factor, the Solicitation required each offeror to "identify all recent contracts where it . . . experienced any performance problems that occurred within three years prior to the closing date of this RFP." AR 135 (RFP § L.5.3.5.1).  For each contract identified, the Solicitation instructed the offeror to "provide copies of all Level III Corrective Action Reports (CARs), Cure Notices, Level III Nonconformance Reports (NCRs) or Show Cause letters received regardless of whether or not the contract was provided as a contract reference in the Offeror's task order proposals to date" and include further information, such as "the contract number, a brief description of the issue, the corrective actions taken to avoid recurrence of the problem, the extent to which the corrective action has been successful, a mitigation plan of how to prevent similar future issues, and [contacts to] confirm the success of the corrective measures." *Id.*

Concerning the government's evaluation of each offeror's past performance, the Solicitation provided that:

> The Government may consider the recency, relevancy, source and context of the past performance information it evaluates, as well as general trends in performance, and demonstrated corrective actions. A significant achievement, problem, problem resolution or lack of relevant data in any element can become an important consideration in the assessment

process. An adverse finding in any element or a lack of
relevant data in regards to a performance issue may result in
an overall lower confidence assessment rating.

AR 148 (RFP § M.5.2.5).  The Solicitation defined "recency" as "any contract under
which any performance, delivery, or corrective action has occurred within the following
time standards: three (3) years prior to this RFP closing date, regardless of the award
date."  AR 148 (RFP § M.5.2.7).

Our Court has explained that "[i]n the bid protest context, the assignment of a
past performance rating is reviewed 'only to ensure that it was reasonable and
consistent with the stated evaluation criteria and applicable statutes and regulations,
since determining the relative merits of the offerors' past performance is primarily a
matter within the contracting agency's discretion.'"  *Glenn Def. Marine (Asia), PTE Ltd. v.
United States*, 105 Fed. Cl. 541, 564 (2012) (quoting *Todd Constr., L.P. v. United States*, 88
Fed.Cl. 235, 247 (2009)), *aff'd*, 720 F.3d 901 (Fed. Cir. 2013).  Put differently, the Court
affords great deference to an Agency's evaluation of an offeror's past performance.  *Am.
Auto Logistics, LP v. United States*, 117 Fed. Cl. 137, 185 (2014), *aff'd*, 599 F. App'x 958
(Fed. Cir. 2015); *see also Torres Advanced Enter. Sols., LLC v. United States*, 133 Fed. Cl. 496,
531 (2017) ("When a protestor challenges a procuring agency's evaluation of past
performance, the court's review is limited to ensuring that the evaluation was
reasonable and performed in accordance with the solicitation; in other words, the
procuring agency's evaluation is entitled to great deference.").

In the instant case, Vectrus's proposal identified a Fort Bragg, North Carolina
task order and included a Level III CAR, which – in compliance with the Solicitation's
requirements concerning past performance – included information such as areas of
concern, mitigating actions, and the current status/verification of effectiveness for
resolving the identified issues.  AR 2375-88.  VS2 argues that the Agency failed to
rationally consider Vectrus's "'critical'" non-compliance recognized in Level III CAR,
especially in light of the similarities between the PWS requirements in the Fort Bragg
task order and the task order at issue here.  Pl. MJAR at 40-42 (quoting AR 2380).  While
the Court concurs with VS2 that issues identified in the Level III CAR are real and
severe, "the court is not empowered to substitute its judgment for that of the agency"
where the Agency's conclusions find support in the record.  *Navarro Rsch. & Eng'g, Inc.
v. United States,* 151 Fed. Cl. 184, 192 (2020) (citations omitted).  In assessing Vectrus's
past performance, the Agency reasonably relied on three positive CPARS specifically
related to the Fort Bragg task order:[28]

---

[28] According to the Army's evaluation of Vectrus's past performance, "[f]or recent reference
W52P1J-13-G-0027 0001 Vectrus performs services as the Prime Contractor on the EAGLE Fort
Bragg, North Carolina Task Order that includes Maintenance, Supply and Transportation
services under a standardized EAGLE PWs."  AR 5443.

| Contract: W52P1J-13-G-0027_0001 | CPAR | CPAR | CPAR |
|---|---|---|---|
| Last Date of Assessment Period | 6/29/2017 | 6/29/2018 | 6/29/2019 |
| Quality | Very Good | Very Good | Very Good |
| Schedule | Very Good | Very Good | Very Good |
| Cost Control | Satisfactory | Very Good | Satisfactory |
| Management | Very Good | Very Good | Satisfactory |
| Utilization of Small Business | Exceptional | Exceptional | Exceptional |
| Regulatory Compliance | Very Good | Very Good | Satisfactory |

AR 5446.  Further, the assessing official concluded that "they would recommend Vectrus for similar requirements in the future."  *Id.*

In the Agency's evaluation of Vectrus, the Agency further explained:

> Vectrus and subcontractor DA Defense has a significant amount of recent and relevant experience. Vectrus has and is successfully performing an EAGLE effort that is very comparable to this effort. DA Defense provided references in which they performed as successful subcontractor. Based on the overall performance record of the proposed team, the Government has a high expectation that the Offeror will successfully perform the required effort.

AR 5447.  The Agency made this assessment while in possession of the Level III CARS Vectrus provided and after considering the positive CPARS from that very same task order.  The record thus belies VS2's assertion that "[t]he Army did not consider, let alone analyze, the performance problems reported in the Level III CAR[.]"  Pl. MJAR at 41.  Consequently, the Court concludes that the Agency's assessment of Vectrus's past performance was reasonable.

## IX.  INJUNCTIVE RELIEF

The Tucker Act vests this Court with authority to award "any relief that the court considers proper, including . . . injunctive relief."  28 U.S.C. § 1491(b)(2); *see* RCFC 65. In evaluating whether permanent injunctive relief is warranted in a particular case, the Court must consider: (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff has shown irreparable harm without the issuance of the injunction; (3) whether the balance of the harms favors the award of injunctive relief; and (4) whether

the injunction serves the public interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). As discussed *supra*, VS2 has succeed on the merits of its claim that the Army improperly switched the contract award from VS2 to Vectrus based on a GAO decision that is erroneous as a matter of law.

Under the second factor, "a party seeking a permanent injunction must demonstrate that it will suffer irreparable harm without the desired relief." *Turner Const.*, 94 Fed. Cl. at 585. Our Court " 'has repeatedly held that the loss of potential profits from a government contract constitutes irreparable harm.'" *WaveLink, Inc. v. United States*, No. 20-749C, -- Fed. Cl. --, 2021 WL 2762814, at *33 (June 24, 2021) (quoting *BINL, Inc. v. United States*, 106 Fed. Cl. 26, 49 (2012)); *see also Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 319 (2009) ("[I]f a litigant has no action against the United States for lost profits, as is the case here, the harm to the litigant can be considered irreparable."). Here, VS2 will suffer such irreparable harm should the Army's new award to Vectrus be permitted to proceed at this juncture. Although this Court on occasion has noted that economic harm, "without more, does not seem to rise to the level of irreparable injury," *Minor Metals, Inc. v. United States*, 38 Fed. Cl. 379, 381-82 (1997) (citing *Zenith Radio Corp. v. United States*, 710 F.2d 806, 810 (Fed. Cir. 1983)), here there is more than simply economic harm – VS2 would have retained its original award, along with the attendant benefits of experience and a future past performance reference, but for the Army's implementation of an irrational GAO recommendation. VS2 will thus suffer irreparable harm in the absence of an injunction.

In balancing the harms, the Court notes that the government does not assert it will be harmed by an injunction, but rather focused only on the merits of VS2's claims. Def. MJAR at 33 ("[A]s explained above, VS2 cannot establish that either GAO or the Army acted irrationally or unlawfully. Therefore, there is no reason for the Court to intervene in the procurement process."); *see also* Oral Arg. Tr. 94:16-19 (government agreeing that "since you don't know what they would have done" in the absence of the MPC adjustment, "if you want the agency to make that assessment again, they will certainly do so"). Given that the parties informed the Court at the start of this case that the Agency intended to issue a bridge contract through September 10, 2021, there is nothing in the record indicating that the Agency would have to halt or somehow unwind any current contract performance should an injunction be issued, nor is there any evidence that the Agency would be harmed by reconsidering the implications of a risk assessment it has already performed. *See, e.g.*, Oral Arg. Tr. 42:19-24. The Court concludes that the balance of hardships favors VS2.

Finally, the public interest favors granting an injunction because "[t]here is an overriding public interest in preserving the integrity of the procurement process by requiring the government to follow its procurement regulations." *Hospital Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005); *see also CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 496 (2013) ("'The public interest in honest, open, and fair

competition in the procurement process is compromised whenever an agency abuses its discretion.'" (quoting *PGBA, LLC*, 57 Fed. Cl. at 663)).  The record demonstrates that the Agency's decision to cancel VS2's award and instead award the contract to Vectrus was based on an irrational GAO recommendation, which taints the procurement process. That is particularly true where, as here, the Solicitation itself required the Agency to consider performance risk due to the cost caps as part of the Agency's cost realism analysis. Thus, the Court concludes that the fourth factor favors VS2, as well.

Accordingly, the Court will issue a permanent injunction.

### CONCLUSION

For the above reasons, the Court: **GRANTS** VS2's motion for judgment on the administrative record; **DENIES** the government's motion for judgment on the administrative record; and **DENIES** Vectrus's motion for judgment on the administrative record.  The Clerk shall enter **JUDGMENT** for Plaintiff, VS2.

Given the Court's findings on the injunctive relief factors, the Agency is further directed as follows:

1.  The Court permanently enjoins the *current* contract award to Vectrus.

2.  The Agency must reconsider its contract award decision, taking into account not only the corrected cost evaluation, after removing the upward MPC adjustment, but also the Agency's prior risk assessment performed as part of its cost realism analysis (as well as any related findings in the technical evaluation, if warranted), as detailed in this Opinion and Order, *supra.  See, e.g.*, AR 149 (RFP § M.5.3.2.1).  In so doing, the Agency must consider the magnitude of the quantitative MPC adjustment as a measure of performance risk, even though the sum itself cannot be added to Vectrus's evaluated cost.

3.  Relatedly, the Agency also must reconsider its responsibility determination, specifically with regard to the fact that Vectrus might incur a substantial loss if it were awarded the contract at issue.

4.  In issuing this equitable relief, the Court does not reverse the Agency's award decision, but rather gives due regard to the Agency's discretion in the first instance.  The Court thus neither orders the contract to be awarded to VS2 nor precludes the Agency from issuing a new contract award to Vectrus.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge